**Mary P. LAFFEY et al., Plaintiffs,**

v.

**NORTHWEST AIRLINES, INC.,
Defendant.**

**Civ. A. No. 2111–70.**

United States District Court,
District of Columbia.

Nov. 12, 1973.

See also, D.C., 321 F.Supp. 1041.

---

Michael H. Gottesman, and Dennis D. Clark, of Bredhoff, Barr, Gottesman, Cohen & Peer, Washington, D. C., for plaintiffs.

Gilbert Feldman, of Kleiman, Cornfield & Feldman, Chicago, Ill., for Air Line Stewards and Stewardesses Assn., Intern., Transport Workers Union of America, AFL–CIO, for a portion of the trial, for plaintiffs.

Henry Halladay, and David A. Ranheim, of Dorsey, Marquart, Windhorst, West & Halladay, Minneapolis, Minn., for defendant.

Karl W. Heckman, U. S. Dept. of Labor, appeared for portions of the trial; no evidence was presented by the Department of Labor.

AUBREY E. ROBINSON, Jr., District Judge.

The above-entitled matter came on for trial before the undersigned Judge of the above Court commencing on December 4, 1972, and continuing thereafter until January 10, 1973.

Based upon the oral testimony at trial, the designated deposition testimony submitted to the Court, exhibits introduced by both parties, and all of the files, records and proceedings herein, the Court being duly advised in the premises, in accordance with Rule 52 of the Federal Rules of Civil Procedure, makes and enters its Findings of Fact, Conclusions of Law and Order for Judgment as follows:

## FINDINGS OF FACT

1. The named Plaintiffs are [or were] female cabin attendant employees of Northwest Airlines, Inc. [hereinafter "NWA" or "the Company"], and this action has been certified as a class action on behalf of all NWA female cabin attendants employed at any time from July 2, 1965 to the present.

2. The Defendant, NWA, is an air carrier which was formed in 1926, and it currently maintains its corporate headquarters and main base at the Minneapolis-St. Paul International Airport in Minnesota.

3. NWA first began passenger service between Minneapolis-St. Paul and Chicago, and from 1927 to 1946, extended its routes to other cities in the continental United States. Virtually all of NWA's flights cross state lines, and it is engaged in interstate commerce. In 1947 NWA began scheduled service to the Orient, and since that date has increased the number of its routes within and without the continental limits of the United States. NWA has used various types of equipment to fly these routes

over the years, including (1) propeller driven equipment [DC–4, Stratocruiser, DC–6, DC–7] accommodating between approximately 25 and 100 passengers with a cabin crew complement of two or three, (2) jet equipment [DC–8, 727, 720B, 707–320] accommodating between approximately 100 and 150 passengers with a cabin crew complement of five, and (3) the new wide-bodied jet equipment, including the 747 and the DC–10, carrying as many as 362 passengers with a cabin crew complement of as many as sixteen.

4. NWA's international operations are extremely competitive, much more so than its domestic operations. There is no significant market in NWA's international system that is not competitive with at least two or more international carriers. Most of these carriers are significantly larger than NWA and also have the competitive advantage of operating around the world, thus being able to carry through-traffic beyond the New York and Hong Kong termination points of NWA's system.

5. In a normal year not subject to the impact of a strike, NWA handles approximately seven million passengers producing gross revenues of approximately $450 million. This ranks NWA approximately seventh among the eleven trunk carriers in the United States. From 1968 through 1970, NWA lead all United States air carriers in annual net profits, earning between 44.5 and 51.5 million dollars per year. In 1971, NWA was second in net profits with nearly 21.-5 million dollars, the drop being attributed to the effects of a labor strike in the latter part of 1970.

6. All cabin attendants employed by NWA between 1927 and 1947 were females classified as stewardesses. The company has continued to employ females in the stewardess classification up to and including the present time. In 1947, the Company established a cabin attendant classification of purser. From 1947 through June 15, 1967, the Company followed an express policy of confining the purser job solely to males.

In 1949, the Company established a cabin attendant classification of flight service attendant (FSA), which has always been filled exclusively by males. The FSA classification was established when the Company began utilizing a plane called the Boeing Stratocruiser, which had a sunken bar lounge. The Company decided that a male cabin attendant should be assigned to the bartending function (as well as other cabin attendant duties) on this plane. Except for the cocktail service on this plane, FSA's were hired to perform the same duties that female stewardesses performed.

7. On December 17, 1946, the National Mediation Board certified Air Line Stewards and Stewardesses Association, International (hereinafter "ALSSA") as the duly designated collective bargaining representative of NWA's female cabin attendants. This certification subsequently was amended on October 22, 1948, to provide that ALSSA also was the duly designated representative of NWA's pursers, and again on June 20, 1950, to provide the same representative for NWA's male cabin attendants. On July 7, 1961, ALSSA having affiliated with the Transport Workers Union of America, AFL–CIO, the National Mediation Board certified "Air Line Stewards and Stewardesses Association, International, Transport Workers Union of America, AFL–CIO" as the duly designated representative of all cabin attendant and purser employees of NWA. In 1971 NWA's cabin attendants and pursers voted to replace ALSSA with Air Line Pilots Association, International (hereinafter "ALPA") as their representative, and the National Mediation Board so certified on September 17, 1971. ALPA has joined this action as a "non-aligned party."

8. At all times the membership of NWA's cabin attendant class or craft (including pursers) represented by ALSSA or ALPA has been predominantly female, so that females always have and still do possess a clear numerical superiority over males in the affairs of the class or craft and the union representa-

tive. The members are called upon to vote for their representatives within the internal union structure, to state their views and proposals in connection with collective bargaining, to ratify new agreements, and otherwise to participate in the process by which their rates of pay, rules and working conditions are established.

9. At all times from December 17, 1946 to date, NWA has entered into collective bargaining negotiations and agreements with the certified union representative, ALSSA or ALPA, pursuant to the mandate of and the procedures outlined in the Railway Labor Act, 45 U.S.C. § 151 et seq. The agreements have covered all United States-based cabin attendants and pursers, but not those based in the Orient and assigned exclusively to flights within the Orient ["interport"].

10. Since at least 1943, NWA has employed female cabin attendants as "stewardesses." In the first collective bargaining agreement, dates September 19, 1947, a "stewardess" was defined as:

. . . an employee who is responsible for the performing or assisting in the performance of all enroute cabin service, or ground service, to delayed or canceled passengers, and shall include the responsibility for the welfare, comfort, enjoyment and safety of the passengers, as prescribed by the Company regulations.

A salary was established for that position. The definition has continued to the present, and the salary has increased over time by union negotiation and agreement.

11. In 1947 when NWA obtained and began flying routes to and through the Orient [see Finding 3], the purser classification was established. In the first collective bargaining agreement including pursers, dated January 1, 1949, the position of "flight purser" was defined as follows:

"Flight Purser" means an employee on the international division whose work includes performing and assist-

ing in the performance of all enroute cabin service, attending to passenger comfort, responsibility for the preparation and completion of passenger, crew, and cargo manifests and other reports and documents as may be required by the Company or by law. A flight purser may be designated to perform necessary duties in connection with flight cargo operations, may be designated as being in charge of other cabin attendants, may be required to accept special assignments related to flight purser duties, and from time to time may be requested to participate in publicity and promotional assignments not in violation of any of the terms of this Agreement.

The definition of a "purser" has continued to the present time. A salary was established for the purser position at a rate higher than that for the stewardess position. The salary for the position has increased over time pursuant to union negotiation and agreement.

12. In 1949 NWA began hiring male cabin attendants as "flight service attendants" [FSA's] to fly particularly on the Boeing Stratocruiser aircraft. They were to perform essentially the same duties as female cabin attendants on those and other flights. Effective with the 1951 collective bargaining agreement, FSA's were included in the definition of "Stewardess" appearing in the earlier agreements, which was carried forward thereafter.

13. Beginning with the 1951 collective bargaining agreement and continuing thereafter to date, a combined purser-FSA seniority list was created by virtue of which FSA's began accruing seniority as pursers immediately upon commencing their duties as FSA's.

14. From 1951 until the June 15, 1967 collective bargaining agreement, FSA's had a contractual right to fill purser vacancies in seniority order. From 1951 on, as permanent vacancies in the purser position arose, notices of the purser vacancies were posted, addressed only to male employees. At no

time did the Company fail to award a purser vacancy to the most senior FSA bidding for it. The Company's policy was that any FSA who had successfully completed his FSA probationary period was thereby deemed qualified for purser vacancies.

15. As temporary vacancies in purser positions arose, FSA's were temporarily elevated to fill such vacancies and received purser pay for doing so. When they were promoted to permanent purser positions, they received credit on the purser pay scale for the time spent filling temporary purser vacancies.

16. FSA's who chose to pass up promotional opportunities to purser and then later promoted to purser jumped ahead for all seniority purposes, of junior employees who had been promoted ahead of them.

17. The Company hired its last FSA in 1957 (the discontinued use of the Boeing Stratocruiser having eliminated the Company's interest in having FSA's). Between 1957 and 1964 all purser vacancies were filled by the promotion of FSA's in the manner described above. By mid-1964, the Company had exhausted the supply of FSA's who desired elevation to purser positions. As subsequent purser vacancies arose, the Company invoked its contractual right to transfer "the most junior employee" to force the remaining few FSA's who were based in Minneapolis to transfer to the Seattle base and fill purser vacancies. By May 1965, there remained only three FSA's, all voluntarily based in Honolulu flying on military charter flights for the United States Government, certain of which required the use of male cabin attendants only.

18. As of May 1, 1965, just prior to the effective date of Title VII of the Civil Rights Act of 1964, the Company employed 48 male pursers, no female pursers, three male FSA's, and 724 female stewardesses.

19. The last purser was hired by the Company on April 25, 1970. As of that date, the Company employed 137 male cabin attendants, all as pursers, and 1,747 female cabin attendants, all but one classified as stewardesses. (The single female purser was Mary P. Laffey, who was promoted from the classification of stewardess effective October 4, 1967).

20. Between May 1, 1965, and May 1, 1970, the Company hired 118 new male cabin attendants, all of them as pursers. During the same period, it hired 2,224 new female cabin attendants, all of them as stewardesses.

21. Recently, NWA has hired several male cabin attendants as "stewards" to perform the same duties as stewardesses and FSA's and at the same union negotiated and agreed upon rate of pay. At all times from 1949 to the present, FSA's and stewards have been compensated at the same rate as stewardesses of equal longevity. The single compensation schedule provided by union contract for the cabin attendant classification establishes periodic increments based upon accumulated longevity in that classification. In addition to the basic compensation, cabin attendants engaged in "foreign flying" [flights to or from foreign countries, Alaska or Hawaii, excluding Winnipeg, Canada] have been compensated either according to a separate schedule at a higher rate or according to a specific hourly supplement. Pursers receive no such supplement.

22. The Company and ALSSA engaged in collective bargaining negotiations in 1963 and 1964, from which eventuated the 1964 colective bargaining agreement. In those negotiations, ALSSA sought a provision which would permit stewardesses to progress to purser vacancies in seniority order after the last FSA who desired to become a purser had done so. The Company refused to agree to this proposal and it was not included in the 1964 agreement.

23. In 1966 and 1967, the Company and ALSSA engaged in the next round of collective bargaining negotiations eventuating in the agreement which became effective June 15, 1967. One of the Company's opening proposals was

that a single "cabin attendant" classification be established, in lieu of the three classifications of purser, FSA and stewardess, and that the rate of pay for this single classification be the rate then paid to stewardesses and FSA's. The Union opposed this proposal, and it was not adopted. One of ALSSA's proposals was that stewardesses be permitted to progress to the position of purser in seniority order, as FSA's had in the past. The Company refused to accept ALSSA's proposal, but stated that it would agree to a provision permitting stewardesses to bid for purser vacancies if the Company was allowed a right of "selectivity". ALSSA acceded to the Company's proposal because it was convinced that it was the most it could achieve. The provision as it appeared in the 1967 agreement provided:

"d. Employees will be notified by posting on the bulletin board of any vacancies occurring within the purser classification. Stewardesses and flight service attendants will be given consideration if they make written application for any such positions. In considering the applications the Company will give consideration, among others, to the employee's past service record, length of service, leadership ability, and test results." (P–79, Sec. 9(d)).

This provision replaced the following clause which had appeared in the 1964 agreement, as well as the preceding agreements:

"d. Flight service attendants will be given an opportunity to qualify as a flight purser at any time the Company desires provided that all promotions to the status of flight purser shall be in the order of their seniority subject to the provisions of this section."

24. The opportunity for stewardesses to seek purser vacancies under the 1967 agreement differed from the manner in which FSA's previously filled such vacancies in the following additional respects:

(a) The 1967 agreement contained a review procedure for stewardesses whose bids for purser vacancies were denied, but that procedure was available only to stewardesses who had "at least four (4) years of service with the Company on flights to which a purser has been assigned." The Company insisted on this limitation to discourage bids for purser vacancies by stewardesses who did not have four years' flying with a purser. A majority of the Company's male pursers became pursers without having flown for four years on flights with a purser.

(b) Whereas the probationary period in the 1964 agreement and in the agreements prior thereto had been "the first four (4) months of service as a flight purser," the provision was changed in the 1967 agreement, at the Company's insistence, to "the first six (6) months of service as a flight purser".

(c) The 1967 agreement left intact the combined FSA-purser seniority list. The effect of this was that stewardesses becoming pursers would go to the bottom of the purser seniority list, whereas both before and after 1967 FSA's who became pursers received credit for their years of FSA service on the purser seniority list. Seniority on the purser seniority list determines the order of bidding for schedules, vacation preference, the order in which pursers are laid off and recalled during reductions in force and restorations in force, and priority in obtaining voluntary transfers to other bases. Additionally, those at the bottom of the purser seniority list are subject to involuntary transfers from one base to another. The most junior employees on the purser seniority list usually wind up with "reserve" schedules. Reserve schedules are

generally considered the least desirable, as the employee has no choice of itinerary and must remain available at his telephone for most of the month to be summoned on short notice.

(d) Although FSA's who had completed their probationary period were deemed qualified for purser vacancies under the pre-1967 agreements, no similar policy was applied with respect to stewardesses bidding under the 1967 agreement.

(e) Following the signing of the 1967 agreement, the Company decided to "upgrade" its standards for selecting pursers, and to place greater emphasis on the qualities of supervisory capacity and leadership ability than it had in the past. As part of this greater emphasis on supervisory capacity, the Company decided to begin utilizing tests which had not previously been utilized in the selection of pursers. None of the tests administered to applicants for any cabin attendant positions prior to 1967 had been utilized by the Company to measure supervisory potential or supervisory capacity When FSA's progressed to purser prior to 1967, they took no tests as a prerequisite to becoming a purser; following the signing of the 1967 agreement, however, stewardesses seeking purser positions were subjected to tests.

25. Stewardesses have been deterred from bidding for purser vacancies since 1967 because:

(a) Under the terms of the agreement they would go to the bottom of the purser seniority list, have last choice in selecting schedules, have to fly reserve, have last choice in selecting vacation time, be the first laid off in a reduction in force, and be subject to involuntary transfers to other bases.

(b) If they are senior, under the terms of the agreement they would not receive any greater pay for a substantial period of time then they would receive by remaining a stewardess.

26. Following the signing of the 1967 agreement, the NWA personnel office was instructed to consider stewardesses for purser vacancies. It was not told to consider female applicants other than stewardesses and it never did. Despite a lack of well qualified applicants for the purser position, the Company did not canvass the stewardess ranks, nor consider applications from females who were applying for stewardess positions. Rather, the Company resorted to advertising and lowering of standards to recruit pursers from outside.

27. When the Company anticipated purser vacancies, its practice was to hire men off the street, put them through its five-week cabin attendant training program, and *then* post notices of purser vacancies. These men were "assured of a job." If the Company awarded a purser vacancy to a stewardess who bid for it, the result would be that the Company had a purser excess, and as future needs arose, no vacancies would have to be posted.

28. Late in the Summer of 1967, without posting notices of the existence of any purser vacancies, the Company hired five male applicants as pursers and entered them into its training program. These males were hired to fill purser vacancies in October 1967. Laffey learned of the hiring of the men and complained to Homer Kinney, the Company's Director of Labor Relations, that the hiring of these men without posting notices of the purser vacancies violated the 1967 agreement. Kinney acknowledged that Laffey was correct, and a notice was posted on October 20 advising that five purser vacancies at the Seattle base were available for bid, to be filled on or about November 10, 1967. Meanwhile, the five males had completed their training and were assigned to purser positions on October 4, 1967.

29. Two stewardesses bid for these vacancies; Laffey, who had nine years seniority as a stewardess, and Shirley

Linburgh, who had 15 years seniority. Linburgh's bid was received a few hours past the bid deadline, and she was advised that consequently her bid would not be considered, despite the fact that five vacancies were posted and only two cabin attendants bid for such vacancies.

30. Although the vacancy for which Laffey bid was to be filled on approximately November 10, 1967, that date passed without Laffey learning anything in response to her bid. She inquired of R. R. McPherren, her supervisor. McPherren wrote to Kinney on November 21, inquiring about the delay in processing Laffey's bid; Kinney responded that the delay was because the Company was obtaining new tests to be administered to purser applicants. While Laffey was waiting, the Company hired two more men as pursers, without giving them the tests which (because not yet developed) were the stated reason for making Laffey wait. (Nor were the five male pursers hired in October, 1967, given these tests).

31. Laffey received no response to her bid until April 1968, despite repeated demands by her that the bid be acted upon. This was an unusually long delay for filling a posted purser vacancy. On or about April 10, 1968, Laffey phoned Kinney to remind him that it was now nearly 5 months since the vacancy had been scheduled to be filled. Not until after this inquiry did the Company begin to seek new tests to be administered to purser applicants. Kinney instructed Virgil Fencl, the Company's Director of Employment, to obtain such a test. Fencl then contacted Doctor Lowell Hellervik, a testing specialist who provided regular consulting services to the Company, and requested a short test which could be used to identify supervisory potential in purser candidates. Shortly thereafter, Hellervik recommended to Fencl that the Company use a test called the "Self-Description Inventory," and submitted the test to Fencl on April 17, 1968. In May, Laffey was finally tested and interviewed. In June, she was notified that her bid for the purser vacancy was granted. She became the first and only female purser in NWA.

32. The Company initially advised Laffey that her seniority date on the purser seniority list would be the date of her actual assignment to the purser job in June, 1968. Laffey protested that this would place her below the male pursers who had been hired in October 1967, without the posting of notices as required by the 1967 agreement, as well as below the male pursers who had been hired in December 1967 while her bid was pending. Finally, the Company assigned her a purser seniority date of October 4, 1967.

33. For pay purposes, the Company placed Laffey on the bottom step of the purser salary scale, and began paying her a smaller salary than she had received as a senior stewardess. Laffey filed a grievance protesting that this violated Section 3(i) of the 1967 agreement, which provided: "No reduction in pay shall be suffered by an employee by virtue of his accepting a purser assignment." The Company ultimately acquiesced and raised Laffey's salary to that which she had been receiving as a stewardess. Thereafter, the Company treated Laffey as moving one step up the purser salary scale for each six months she served as a purser. It was not until Laffey reached the fifth step of the purser salary scale that she began to receive a higher salary than she had received as a stewardess; until that point, she continued to receive her stewardess salary pursuant to the "no reduction in pay" provision.

34. Because Laffey was not given credit for her years as a stewardess when she was placed on the purser seniority list, she occupied a relatively junior position on that list, and was forced to bid the least desirable schedules, frequently having to fly as a reserve purser.

35. In July, 1970, the Brotherhood of Airline Clerks (BRAC), which represents certain of the ground personnel employed by the Company, struck. The

strike lasted until mid-December, 1970. The Company flew only a portion of its flights during the strike. At the conclusion of the strike, the Company decided to remove pursers from certain flights on which it had previously used them. As a result, a number of pursers were demoted to FSA's, and Laffey was demoted to stewardess. As purser vacancies have arisen since December, 1970, they have been filled by the demoted pursers in the order of their purser seniority. Because reductions in force are governed by purser seniority, Laffey was one of those who lacked sufficient seniority to remain as a purser. From that date until the present, she has been reduced to her former status as a stewardess and has been paid as such, while men hired in 1965 and 1966 have continued to fly as pursers. Had she been assigned a purser seniority date which included her seniority as a stewardess (in the same manner that FSA's who progressed to purser had their seniority as an FSA included in their years of service as a purser), she would have had sufficient seniority to remain as a purser at the time of the reduction in force and at all times thereafter to the present date.

36. Other stewardesses who submitted bids for purser vacancies were refused.

(a) In late 1967, Alice Bernhard, a stewardess with 8½ years of seniority, submitted a timely bid for a purser vacancy to be filled in late December. Bernhard received a letter from McPherren advising that her "qualifications at this time are not sufficient" to be a purser. No tests were administered to Bernhard, nor was she interviewed, prior to the Company's rejection of her bid. She did not file a grievance concerning the denial of the bid.

(b) In October, 1969, stewardess Carolyn A. Blair (now Carolyn Ingold) submitted a timely bid for a purser vacancy. On November 5, 1969, McPherren wrote to Blair that her bid was rejected because her quali-

fications were insufficient to be a purser. The Company neither interviewed nor tested Blair prior to the sending of this letter. Blair's pre-employment interviews and tests, and her cabin attendant evaluations, reflected that she was mature, unusually intelligent, and a dedicated cabin attendant. She did not file a grievance concerning the denial of the bid.

(c) In April, 1969, Janice P. Smith, a stewardess with five years' seniority, went to the Company's Cabin Service Office in Seattle, filled out an application for employment as a purser, addressed it to the Company's general headquarters in Minneapolis, and left it for delivery in the intracompany mail. She received no response to her application. In late 1969, Smith went to the Seattle office and asked McPherren what was happening with respect to her application. McPherren responded that he was not aware that she had made an application. Smith replied that she had, and asked if she could fill out another application in McPherren's presence, or file a letter of preference. McPherren replied that she could not, and that she would have to wait until a notice of purser vacancy was posted and bid at that time. Smith said that she would rather leave an application, as she had not seen notices in the past and feared that she would miss them and thus not be able to bid when purser vacancies arose. McPherren told her that those not employed with the Company, or employed in non-cabin-attendant positions, could seek purser positions through such applications, but that stewardesses had to wait until a posted vacancy appeared.

(d) On March 21, 1970, stewardess Beverley Emge submitted a timely bid for a purser vacancy at the Washington base. No other bids were submitted for the vacancy, and Emge was invited to Minneapolis

(she was based in Washington, D. C.) to be interviewed on April 17, 1970, by James Robertson, the Company's Director of In-Flight Services. Robertson told Emge that if she took the vacancy she would be the junior purser and thus would have no choice in her bidding assignments, that she would suffer a cut in pay, and that, as the junior purser, she would be subject to being involuntarily transferred to other bases. He told her that the Company was contemplating a reduction in the size of its Washington base, and an expansion of its Honolulu base, so that· Emge would run a serious risk of being transferred to Honolulu if she accepted the bid. Emge did not wish to leave the Washington, D.C. area. Based upon Robertson's representations that her acceptance of the purser vacancy might result in her involuntary transfer to Honolulu, she was doubtful whether to take it. Robertson told her that she had to decide immediately, as there was a male cabin attendant at another base who was anxious for the vacancy. Emge said she would withdraw her bid, and Robertson had her sign a letter, which was already prepared and typed, withdrawing her bid.

1. Three days later, the Company posted a notice announcing yet another purser vacancy at the Washington base, to be filled on or about May 2, 1970. Upon seeing this posting, Emge had a change of mind and accordingly, on April 23, 1970, submitted a bid for this new purser vacancy at the Dulles base.

2. The notice had stated that bids had to be submitted no later than noon Pacific Daylight Time on May 1, 1970. By the close of business on April 30, Emge's was the only · bid for this vacancy. Early in the morning of May 1, 1970, at or prior to 7 a. m. Honolulu time, Chalmers Hunter, a purser based in Honolulu, phoned In-Flight Supervisor Jack Gulett, who was staying at a Honolulu hotel, and indicated a desire to transfer to Washington, D.C. Gulett advised Hunter that there was a vacancy for which bids had to be submitted that very day. Hunter said that there was no way he could transmit a bid so that it would be received by the Company in Seattle by the 12 noon deadline (12 noon Seattle time is 9 a. m. Honolulu time). Gulett said that he would try to utilize the Company's teletype equipment for that purpose. Gulett phoned the Company's crew scheduling office in Honolulu and instructed an employee to get the bid on the machine immediately." The teletype operator types the time of transmission on the message. Gulett told him that the bid "had to be dated before noon Pacific time to be valid." According to the Company's records, the bid was received in Seattle at 11:53 a. m. Pacific Daylight Time. Later that day, the Honolulu office received a reply teletype from Seattle announcing that Hunter was the successful bidder for the vacancy.

3. Emge's seniority date is September 29, 1961. Hunter's seniority date is November 16, 1969. On the ground that she had greater seniority, Emge filed a grievance protesting the award of the purser vacancy to Hunter. The Company, thru Robertson, construed the 1967 and subsequent agreements as according junior pursers priority over senior stewardesses if both bid for the same purser vacancy and accordingly, denied the bid.

37. From the time the purser classification was established in 1947 until June 15, 1967, NWA exclusively hired

males for the purser position. The Company desired to confine the purser position to males for the following reasons:

(a) A belief that males could more adequately perform the supervision and conducting job of the purser.

(b) Oriental officials, passengers and cabin attendant were conditioned by custom and mores to deal with and accept leadership and direction of males rather than females.

(c) It was considered important to have male pursers on the transpacific flights to cope with rowdy seaman crews.

(d) Lifting of heavy cargo, food, galleys, baggage could best be performed by males.

(e) During the period from 1963–1970, NWA flew certain military charter flights out of Honolulu on which only males could be used pursuant to United States Government contract and specifications.

(f) An interest in having pursers once trained remain with the Company to avoid need for special purser training and turnover on international routes, the Company experience being that males were more career oriented and more likely to remain with the Company (turnover rate among NWA's female cabin attendants three times greater than male cabin attendants).

38. The Company sought to effect its desire to confine the purser position to males in the following ways:

1) Between May 1, 1965 and May 1, 1970, hiring 119 new pursers, only one of whom was a stewardess (Plaintiff, Laffey) and during same period hiring 2,244 new female cabin attendants. As of April 25, 1970, NWA employed 137 male cabin attendants, all as pursers, and 1,747 female cabin attendants, all but one as stewardesses.

2) Top Company personnel were explicit and candid in expressing personal and Company perference for male

pursers and discouraging stewardesses who applied.

3) Inordinate and unusual delay in processing the bid of Plaintiff, Laffey, the only female applicant to survive an immediate or perfunctory rejection.

4) Disqualification of stewardesses without interview or tests and despite their experience as cabin attendants.

5) Posting notices of pursers vacancies addressed expressly to male employees ("to all purser and FSA's").

6) Failing to consider stewardess applicants for purser positions no matter how well qualified.

7) Hiring and training new pursers in anticipation of purser vacancies, then posting notice of vacancies and thus assuring jobs to new pursers rather than awarding vacancies to possible applicants from the stewardess ranks.

39. Qualifications and requirements for female cabin attendants have differed from male cabin attendants as follows:

1) Female cabin attendants, when hired, sign a form stating: "I understand that among the qualifications and requirements of a stewardesses' position are . . . weight in proportion to height, that failure to maintain such qualifications . . . will be cause for termination of my employment." Male cabin attendants are not required to sign such a form when hired. When hired, female cabin attendants are given a specific weight at which they must report for training; if they arrive at training more than one pound over this prescribed weight, they may be dismissed from class. No such requirement is imposed upon male cabin attendants hired.

2) The Company's Cabin Service Manual contains a table of prescribed weights to, which female cabin attendants must adhere. Prior to the

trial in this case no such weight chart existed for male cabin attendants. All female cabin attendants are weighed on a regular basis at least two times per year, and are also weighed whenever they appear overweight. No such periodic weighing of male cabin attendants takes place.

3) Female cabin attendants who exceed the weight prescribed in the cabin service manual by more than five pounds are advised that they will be grounded and ultimately terminated, unless they return to their prescribed weight within a specific period of time, if they do not return to their prescribed weight they are grounded (i. e. suspended from employment and not permitted to fly) until they have returned to their prescribed weight. Substantial numbers of female cabin attendants have been grounded for exceeding their prescribed weight, and in some instances even terminated.

4) The Company does not regularly monitor the weight of its male cabin attendants, and they have continued to fly even if substantially overweight, without being ordered to lose weight, without being placed on weight check, and without being threatened with grounding or termination. Only rarely have overweight male cabin attendants been placed on weight check (since the effective date of the Civil Rights Act, only three male cabin attendants have been placed on weight check, and of these, two were placed on weight check after the filing of this lawsuit); and only one male cabin attendant has been grounded, for a period of one week, for failure to maintain an appropriate weight. In each of these rare instances the male attendants involved were very substantially overweight, and were permitted to continue flying even though they did not reduce their weight anywhere near that suggested (or even gained additional weight).

5) The Company has always required female cabin attendants to share hotel rooms on lay-overs away from their home base.

6) Since at least 1964, male cabin attendants have been provided with single rooms on lay-overs. This has been so, for the most part, even where two or more male cabin attendants have been on the same flight. In April 1971, the Company issued a bulletin purporting to remind male cabin attendants "of a Company policy which has existed for many years that when there are two male cabin attendants on a crew, they will share a room at lay-over points." However, the Company rarely, if ever, enforced such a policy, in that even when two male cabin attendants were on the same flight, they obtained single rooms which the Company paid for without objection to the male cabin attendants. On most interport flights (flights beyond Tokyo) there is one male American purser and one male Asian flight service attendant, but they have not been required at any time to share rooms.

7) The Company maintains a rule forbidding all female cabin attendants from wearing eyeglasses, but does not maintain such a rule with respect to male cabin attendants hired prior to September, 1971.

8) Female cabin attendants are subject to discipline, including possible discharge, for violating the Company's rule forbidding them to wear eyeglasses.

9) Female cabin attendants are permitted only to wear contact lenses, which are substantially more expensive than eyeglasses with lenses of comparable quality.

10) At all times, female cabin attendants wishing to carry luggage aboard the plane have been required

to purchase luggage strictly prescribed as to brand, size and color.

11) At no time have male cabin attendants been restricted in their choice of luggage, other than that it be "in good condition."

12) The 1970 collective bargaining agreement provided that male cabin attendants (pursers and FSA's) were to receive a uniform cleaning allowance of $13.00 per calendar quarter. Female cabin attendants did not receive this allowance.

13) Prior to June 21, 1972, the Cabin Service Manual provided that the "chain of command" aboard the aircraft, after the cockpit crew, was purser, then other male cabin attendant if one assigned, and then stewardesses in seniority order. On June 21, 1972, the Manual was changed to provide an order of purser, and then stewardesses or flight service attendants in seniority order.

14) Prior to September 1, 1971, the Company did not hire females as cabin attendants if they were taller than 5′ 9″. The maximum height for females was raised to 6′ 0″ on September 1, 1971. The maximum height for male cabin attendants was 6′0″ at the time when the maximum for females was 5′9″.

15) From the beginning of its operation until June 15, 1967, the Company followed a policy of terminating all female cabin attendants when they married. It never had such a rule with respect to male cabin attendants. Despite a series of EEOC findings of probable cause, beginning in December, 1965, that this policy violated Title VII, the Company resisted changing its marriage rule until the conclusion of collective bargaining negotiations resulting in the June 15, 1967 agreement. At that time it agreed to abandon the policy, and to reinstate only those stewardesses terminated since the effective date of Title VII, and then only if they applied for reinstatement within three weeks of the ratification of the agreement and if they waived all claims to back pay.

16) From the beginning of its operations until 1971, the Company had a policy forbidding the hiring of married females as cabin attendants. It has never had such a rule with respect to hiring male cabin attendants. Despite an EEOC finding of probable cause, in June 1969, that this policy violated Title VII (and despite earlier EEOC findings of probable cause concerning the policy of terminating female cabin attendants when they married), the Company persisted in following this non-hire policy until February, 1971, when it entered into a conciliation agreement with the Minnesota Department of Human Rights to abandon the policy.

17) From 1956 until the June 15, 1967 agreement, the Company had a rule forbidding female cabin attendants from flying following their 32nd birthday. It never had such a rule with respect to male cabin attendants. In September 1968, the EEOC, in response to a charge filed in August, 1966, found probable cause to believe that the age 32 policy was a violation of Title VII. Between late March, 1970, and mid-June, 1970, at least 32 stewardesses filed charges with the EEOC alleging that the Company was discriminating on the basis of sex in its treatment of female cabin attendants. On July 14, 1970, the EEOC sent "Notice of Right to Sue" to at least six of these charging parties, all of whom are named plaintiffs in this action.

40. The diverse types of flight itineraries which the Company operates, or has operated in the past, are described below:

(a) *Pure domestic commercial flights* are those regularly scheduled commercial flights which both begin

and end in the United States, and do not continue on to the Orient.

(b) *Domestic segments of international commercial flights.* Since 1959, most of the Company's transpacific flights have originated in one U.S. city (generally on the East Coast), fly to the West Coast of the United States, and then on to the Orient. Such flights return from the Orient to the West Coast, and then go on to the East Coast. Those portions of such flights which both begin and end in the United States are referred to as "domestic segments of international flights" or "domestic segments."

(c) *Transpacific commercial flights.* The Company has flown regularly scheduled transpacific commercial flights between Anchorage and Tokyo since 1947, between Seattle and Tokyo since the early 1950's, and between Honolulu and Tokyo since August, 1969.

(d) *Commercial interport flights* are those regularly scheduled flights between Tokyo and the other Asian cities serviced by the Company (presently Osaka, Okinawa, Seoul, Taipei, Manila and Hong Kong).

(e) *Military Air Charter (MAC) flights.* For many years the Company has contracted with the U. S. Government to provide regularly scheduled military air charter flights between various cities and/or military bases. Such service has included pure domestic, domestic segment, transpacific, and interport flights. In addition from 1963 through June 1970 the Company provided MAC flights between Hawaii and several military bases in the Coral Islands in the Pacific.

(f) *Commercial charter flights.* In addition to its regularly scheduled flights, the Company frequently enters into agreements to provide commercial charter flights. Such service has included pure domestic, domestic segment, transpacific, and interport flights.

41. The diverse flight itineraries described above have been manned by cabin attendants in various manners. Some of the Company's flights are scheduled to be flown exclusively by stewardesses and FSA's. Some are scheduled to be flown by one purser and the rest stewardesses and FSA's. Some have been scheduled to be flown by more than one purser. Purser utilization on these various types of flights is described below:

(a) In general, *pure domestic* commercial flights have always been scheduled to be flown exclusively by stewardesses and FSA's. The major exceptions where pursers have been used are listed below:

(1) Between 1949 and 1954, the Company regularly scheduled a purser on each of its flights between Seattle and Honolulu, and in recent years pursers intermittently have been scheduled on such flights; also, throughout 1970 pursers were regularly scheduled on certain pure domestic flights between Seattle and Honolulu.

(2) Throughout 1970, in an effort to enchance its service and competitive position the Company regularly scheduled a purser on its flights from Honolulu to Chicago and New York and return.

(3) At various times, in order to "position" pursers or to have pursers work while "dead heading", the Company regularly has scheduled pursers on some or all of its flights between Seattle and Anchorage.

(4) In emergency situations in which there is a shortage of available cabin attendants, due to illness, strikes, special holiday or weekend plans, or other factors, the Company has utilized reserve pursers, pursers on "time available," and purs-

ers volunteering for overtime assignments on pure domestic flights which normally do not utilize pursers.

(b) From 1959 through 1970, the Company regularly scheduled one purser to each *domestic segment* of an international flight. The itineraries flown by pursers on domestic segments, and the periods during which pursers were regularly scheduled on such itineraries, were as follows:

(1) June, 1959—July, 1970: from Anchorage to either New York or Washington, D.C. (with intermediate stops) and return.

(2) 1960—December, 1970: Seattle to New York (with intermediate stops), and return.

(3) Approximately 1968 or 1969—mid 1970: Seattle to Philadelphia (with intermediate stops), and return.

(4) August 1, 1969—December, 1970: San Francisco and Los Angeles to Honolulu and return.

(c) One purser normally has been scheduled at all times to fly on each *transpacific* commercial flight.

(d) From 1947 to 1952, the Company's *interport* flights were manned with one American purser, as well as one American stewardess. From 1952 to 1957 no American cabin attendants flew on interport flights; they were manned exclusively by Asian cabin attendants based in Tokyo. Since 1957, one American purser normally has been scheduled on each interport flight, with the rest of the crew consisting of Asian cabin attendants.

(e) The Company always has scheduled at least one purser on each *MAC* flight, whether it be pure domestic, a domestic segment, transpacific or interport. Purser utilization on the Coral Island MAC flights (and the pure domestic MAC flights between Hawaii and California) is described in (f) below.

(f) From the inception of the *Coral Island MAC* flights (and the pure domestic MAC flights between Hawaii and California) in 1963 until October, 1969, at least one, and often two pursers were assigned to each flight. From October, 1969 until June, 1970 (when the Company lost its contract for such flights), the entire 3 to 5 member cabin attendant crews on such flights consisted solely of pursers. From 1963 until June 1970, a small group of pursers and FSA's were based in Honolulu to fly the Coral Islands military flights. In addition, for reasons of both economics and expedience, these individuals were used to fly on the military charter flights between Hawaii and California. The very small size of the Honolulu base presented special scheduling problems, even on a regular basis but particularly in emergency situations, and thus more than one purser may have worked on given flights. This was especially true from October 1969 until June 1970, as a result of the fact that all FSA's at the Honolulu base were upgraded to purser for reasons of economics, expedience and relations with NWA's military contract customers. However, paying more than one individual as a purser, pursuant to its established policy [see Finding 34], still was less costly then increasing the number of cabin attendants based at Honolulu with resulting underutilization of their time and the payment of special monthly station allowances.

(g) A purser normally has been scheduled on all transpacific and interport commercial charter flights, on all domestic segments of international charter flights (until December, 1970), and, occasionally, on pure domestic charter flights. NWA does so only if it receives a specific request from the charter group for a purser or supervisory individual, or on those special occa-

sions when (1) pursers are the only ones available to take the flights, or (2) the positioning of pursers for other flights makes it both economic and expedient to have them fly the domestic charters.

42. The Company mans its international flights such that a particular cabin attendant crew (including the purser if one is aboard) flies only one segment of a flight. Thus, one crew will fly the domestic segment, another the transpacific leg, and a third the interport portion. NWA has maintained cabin attendant bases at the following cities during the designated periods: Seattle (at least 1947 to date); Minneapolis-St. Paul (at least 1947 to date); Honolulu (1963 to September, 1971); and Washington, D.C. (approximately 1960 to September, 1971). Pursers have been (or were) based in Seattle from 1947 to date, in Minneapolis-St. Paul from 1947 to 1962, in Washington, D.C. from June 1969 to July, 1970, and in Honolulu from 1963 to September, 1971. Stewardesses have been (or were) based in Seattle and Minneapolis-St. Paul from at least 1947 to date, and in Washington, D.C. during the entire period that base was open. NWA also maintains cabin attendants bases in the Orient, at which are assigned all of the Asian cabin attendants who fly on the interport flights.

43. Each month, the Company constructs cabin attendant schedules, representing the itinerary to be flown by a cabin attendant during that month. Separate schedules are constructed for each cabin attendant base. At each base, separate schedules are constructed for pursers and for nonpursers (i. e., stewardesses and FSA's). The employees in each classification bid for schedules at their base in order of their seniority. Generally, purser schedules are (or have been) constructed such that all of an individual's flights in a given month will be of the same type, i. e., all MAC, all domestic segments, all pure domestic, all transpacific, or all interport (plus transpacific).

44. The Company sought and obtained a provision in the 1967 collective bargaining agreement, entitling it to assign "foreign national" (Asian) stewardesses to the Seattle base irrespective of seniority, and to assign one foreign national stewardess to each transpacific flight irrespective of seniority. (The 1970 agreement changed the phrase "foreign national stewardess" to "stewardess proficient in the Japanese, Korean or Chinese language.") The Company desired to have foreign nationals on its transpacific flights: (a) to have a foreign language proficiency on the flight, (b) to improve the Company's relations with the Asian Governments with which it has to deal, and (c) to attract Asian passengers. Separate monthly flights schedules are constructed for foreign national stewardesses, designed to place one foreign national on each transpacific flight. Foreign nationals are permitted to bid and fly only on these separate schedules. Foreign national stewardesses, who are covered by the collective bargaining agreement, receive the same salaries as other stewardesses of equal seniority, despite their language proficiency and the restricted schedules which they are permitted to bid.

45. The Company and ALSSA engaged in negotiations in 1969 and 1970 which culminated in the March 1, 1970, collective bargaining agreement. In these negotiations, ALSSA proposed that stewardesses be allowed to progress to purser vacancies in seniority order; that stewardesses who become pursers be credited with their full cabin attendant seniority; and that stewardesses who become pursers be slotted into the purser pay scale on the basis of their total cabin attendant seniority. The Company refused to agree to any of ALSSA's proposals. Its chief negotiator stated that the Company "prefers males and intends to have them" and that the Company "wants men because of their leadership ability." The highest ranking female employed by the Company in any capacity is a reservations supervi-

sor. There are 200 to 300 men employed at levels above this highest ranking female.

46. On most of the Company's commercial flights, service is offered in two categories: first class and tourist class. The first class and tourist class capacities of the various planes presently used by the Company are as follows:

| Plane | First Class Passengers | Tourist Class Passengers | Total Passengers |
|---|---|---|---|
| 727–100 | 24 | 69 | 93 |
| 727–200 | 26 | 96 | 122 |
| 720B | 16 | 93 | 109 |
| 707–320B | 22 | 118 | 140 |
| 707–320C | 22 | 120 | 142 |
| 747 | 58 | 304 | 362 |

47. The essential differences in service provided to the passengers in first class and tourist class are as follows:

(a) The seats and the aisles in the first class section are larger.

(b) A better quality of food service, served somewhat more elaborately, is provided in the first class section.

(c) Liquor normally is served free in the first class section, while passengers in the tourist section must purchase liquor.

(d) The number of passengers per cabin attendant is higher in the tourist section than in the first class section.

48. FAA regulations require that the various planes used by the Company carry at least the following number of cabin attendants irrespective of passenger loads:

| | |
|---|---|
| 727–100 | 2 |
| 747 | 8 |
| All others | 3 |

The Company's present policy is to schedule each flight with the minimum of cabin attendants permitted, and to add additional attendants only if there are exceptionally heavy passenger loads. However, at least one additional cabin attendant is always scheduled on interport flights, so that there are more cabin attendants on such flights than on other flights with the same passenger load. The same number of cabin attendants (pursers, stewardesses and FSA's) is assigned to particular aircraft with particular passenger loads, whether or not a purser is one of the attendants, and regardless of the type of flight, i. e., pure domestic, domestic segment, or transpacific (except interport).

49. In general the passenger loads in first class are smaller relative to capacity than those in tourist class, and generally, the commercial flights on which pursers regularly are scheduled have smaller passenger loads relative to capacity than the flights on which pursers are not scheduled. On non-747 aircraft, generally one cabin attendant works in first class and two in the tourist cabin. On the 747, generally two or three attendants work in first class, with five or six in tourist.

50. The relative "work pace" or "work load" of pursers and cabin attendants depends upon a number of variables, including the position being occupied by the individual in the cabin, the type of equipment, the length of the flight, the number of passengers and the number and allocation of the cabin attendants. The smaller passenger load per cabin attendant in the first class section (where the purser works) normally results in a more leisurely work pace than in the tourist section. The workpace and workload on cabin attendants is normally greater on "short hop" schedules than on longer segment flights.

51. Virtually all duties assigned to cabin attendants are performed by all cabin attendants, regardless of classification. In general, cabin attendants are responsible for making pre-departure checks of the cabin; greeting and seating passengers; securing the cabin for take-off; providing food and beverage service, tending to passenger needs; briefing passengers on emergency procedures; guiding and assisting passengers in the event of emergencies; completing required documentation; answering passenger questions; keeping the cabin in a neat and orderly condition, before, dur-

ing, and after the flight; insuring that passengers conform to required regulations; and deplaning passengers.

52. One of the most important (if not the most important) responsibilities of all cabin attendants is insuring, to the greatest extent possible, the safety of passengers in the event of an emergency. All cabin attendants must have detailed knowledge of first aid techniques and be able to deal on an instantaneous basis with a myriad of medical emergencies in flight. All cabin attendants are required to possess a thorough knowledge of emergency procedures and equipment on each type of aircraft the Company operates. To this end (a) a great portion of a cabin attendant's initial pre-hire training is devoted to emergency procedures and equipment; (b) every year each cabin attendant is required to complete an Emergency Recurrent Training course and pass examinations related thereto (or be grounded); (c) each attendant must take a training course in aircraft familiarization each time a new type plane is put into use; (d) pre-departure emergency briefings are conducted by the Senior Cabin Attendant prior to *every* flight; (e) each attendant is required to have thorough knowledge of the voluminous and detailed emergency instructions contained in the Cabin Service Manual; and (f) cabin attendants periodically are evaluated by means of unannounced check rides by supervisors, which include testing on emergency procedures and equipment.

53. Aside from doing everything possible to insure passenger safety in the event of an emergency, the most important aspect of the job of all cabin attendants, whatever their classification, is acquiring and maintaining the goodwill of the Company's passengers. The Company is in the business of, and derives its revenues and profits from, transporting persons from one place to another. The success of the Company depends upon the goodwill of the passengers, the confidence they have in its ability to perform the services offered and the respect they have toward the Company. All cabin attendants play an extremely important part in dealing with the public since they are in contact with the passengers for a prolonged period of time, indeed, for far greater periods of time than any other Company representatives. Thus, no matter which particular duty a cabin attendant is performing at a particular time, as it involves passenger contact the cabin attendant must exercise a high degree of poise, tact, friendliness, good judgment and adaptability.

54. The type and quality of food service offered by the Company varies greatly between its flights, and between first and tourist class sections. The Company offers the following types of food service:

(a) Pre-set casserole service, which is boarded onto the aircraft in pre-set fashion, and requires the cabin attendants to heat the entree item in an oven aboard the aircraft, place it upon the pre-set tray, and deliver the entire meal at one time on a tray to the passenger.

(b) Out-of-galley china course service in which the food is loaded aboard the aircraft in bulk, heated by the cabin attendants in bulk, and is dished onto china dinnerware by the cabin attendants and carried from the galley to the passenger. The meal is served in various courses.

(c) Cart service, which is virtually identical to out-of-galley china course service, except that each course is served to the passenger from a serving cart located in the aisle in front of the passenger. On some flights, a combination of the above types of food service is offered.

55. The pre-set casserole service is generally utilized in tourist class on all of the Company's scheduled commercial flights. This service with meals of a higher quality is regularly used in first class. All types of services variously are (or have been) utilized in first class, the domain of the senior cabin attend-

ant—purser or stewardess. The Company's cabin service manual and periodic service bulletins issued to all cabin attendants carefully describe the preparation and serving procedures for each type of meal service, and the duties of the various cabin attendants with respect to that service.

56. Food and beverage service is one of the competitive components of the Company's passenger service. The Company meets its stiffest competition in this service area on the international routes on which the pursers are present. During the period 1965–1970, in an effort to upgrade the food and beverage service on these flights, the Company hired pursers with food and beverage skills and experience. It also gave special training to pursers and interested cabin attendants in an internationally flavored cart service cuisine. The purser was principally responsible for the proper utilization of this service. Normally the purser dished the food and mixed the drinks while stewardesses served and took orders. Currently, this service is utilized in a more limited fashion on the 747s as an extension of the galley. On flights between Anchorage and Tokyo, which utilize 320 equipment, the full cart service is still used.

57. Pursers perform no duties with respect to food service which are not also performed by stewardesses, either on the same flight or on other flights. The duties assigned to the Senior Cabin Attendant in the preparation and service of cart service are identical, whether such attendant is a purser or a stewardess. The duties of the Senior Cabin Attendant (purser or stewardess) in the preparation and service of first class meals where cart service is not utilized are identical to those of the other first class attendants (where there are such). With respect to food service on MAC and commercial charter flights (and on other flights with no first class service at all), the duties of the Senior Cabin Attendant are the same as all other cabin attendants on such flights.

58. All cabin service attendants variously have certain responsibilities with respect to documentation. Both pursers and stewardesses have certain major responsibilities with respect to liquor service and documentation pertaining thereto. On all regularly scheduled commercial flights, liquor is provided without charge in first class and is sold to passengers in tourist class. No liquor is served on MAC flights. Thus pursers are not responsible for liquor sales and receipts. Cabin service attendants who do sell liquor are responsible for collecting the appropriate prices in whatever currency tendered and when necessary convert Asian currencies into U.S. equivalents. They are required to complete Company records with respect to the beginning and ending inventories of liquor "kits" boarded and a sales and deposit record (Form AC–237) and a beverage usage report form (Form FS–59). In first class, only a beverage use form is required (Form FS–7 or FS–11). On flights carrying tax free liquor, certain United States custom inventory forms must be completed in both first class and tourist. Cabin attendants are subject to discipline for improper completion of any of these forms and the Company is subject to a fine for the improper completion of the United States Customs liquor inventory forms.

59. There are certain other Company documents and forms which all cabin attendants are responsible for at various times:

(a) On all flights, the senior cabin attendant and the senior in tourist must complete the In-Flight-Service report (Form FS–23) on which are recorded the names of the cabin service crew, passenger count, number of beverages sold and meals boarded, departure and arrival times, and comments regarding services or special or unusual events during flight.

(b) On all flights, the senior cabin attendant and the senior in tourist must complete the log book in which

are recorded cabin items requiring servicing or repair.

(c) On all non-747 flights, the senior cabin attendant and the senior in tourist must prepare seating charts. Seating charts are not required on international 747 flights but are required in first class on domestic 747 flights.

(d) On all flights, where circumstances require, completion of forms pertaining to in-flight movies, ticket up-grading, meal vouchers, accident reports and lost and found articles. Cabin attendants are subject to discipline for improper completion of these forms.

60. In addition to the Company forms, and the U. S. Customs forms related to liquor, various governments require that certain documentation be handled by the airline. Cabin attendants (generally the senior cabin attendant) have certain responsibilities with respect to such documentation, which are described precisely in the Cabin Service Manual and cabin service bulletins. There are certain government documentation duties performed on both purser and non-purser flights:

1) On all flights from mainland U.S. to Hawaii the Senior Cabin attendant, almost always a stewardess, is responsible for:

(a) Passing out and collecting an agricultural declaration form (Form A), upon which each passenger is to list any plants or live animals which he is bringing into Hawaii. In passing out the form, the Senior Cabin Attendant tells the passengers what the form is about, and explains how they will know whether or not they are required to fill it out.

(b) Spraying the cabin with an insecticide prior to arrival and recording such on a Certificate of Disinsectization. (From October 1969 to December 1970,

pursers were regularly assigned to some, but not all, of such flights. Between 1954 and 1969, and since 1971, only stewardesses (and FSA's) have been regularly scheduled on these flights.)

2) On flights from the U.S. to Winnipeg, stewardesses are responsible for passing out Canadian customs and immigrations forms to passengers, seeing that the appropriate passengers complete them in flight, and answering passenger questions about them. On flights from Winnipeg to the U.S., stewardesses are responsible for passing out U.S. customs forms (Form 6059–B) to passengers, seeing that they are completed in flight and answering passenger questions about them.

3) The U.S. Immigration Service has had an agreement with the Company since 1967 which permits the Company to accept for passage aliens transiting the U.S. without a visa ("TRWOV"). The Company assumes the responsibility of the alien's continuous transit through, and departure from the U.S., and severe penalties will be levied if a TRWOV passenger should deplane and disappear within the U.S. TRWOV passengers are carried on flights both with and without a purser. Such passengers are placed in the custody of the Senior Cabin Attendant, who must assume direct personal responsibility to assure safe delivery and transfer of TRWOV passengers. The Senior Cabin Attendant maintains custody of the TRWOV passenger's travel documents during the flight. Failure to carry out these responsibilities subjects the cabin attendant to discipline.

4) On all international flights, all cabin attendants are required to complete properly their own customs forms, and also are required to carry a valid passport. Failure to properly comply with these responsibilities subjects the attendant to discipline and can

result in fines of the attendant and the Company.

61. The various governments at all of the international ports served by the Company impose certain policies, procedures and practices with respect to customs, immigration and quarantine (CIQ) requirements. As at the inception of the purser classification in 1947, the purser today is responsible for managing the international CIQ documentation requirements for passengers, crew and cargo. The various governmental CIQ documentation requirements vary and change from port to port, so that pursers are responsible for knowing and complying with these different and changing requirements at United States ports and at each of the various foreign ports, including Tokyo, Osaka, Seoul, Okinawa, Taipei, Hong Kong and Manila. The various international CIQ documents and the detailed procedures with respect to each are subject to frequent revision, sometimes with little or no advance warning. Pursers are required to remain constantly abreast of these changes and to implement them, on many occasions even prior to receiving official instructions or directions from NWA. In addition, there are separate documents required on NWA's military contract flights, which requirements vary with the location of the base. In general, these CIQ duties fall into four categories:

(a) *Transporting a pouch*—receiving and checking the contents of a pouch containing various government documentation from a Company transportation agent (ground personnel) prior to departure and delivering it to another Company transportation agent upon arrival.

(b) *Assembling "manifest books"*— these generally contain copies of the General Declaration, cargo manifests and (on some interport and MAC flights) a passenger manifest. Cargo and passenger manifests (which constitute listings of cargo and passengers aboard the flight, respec-

tively) are filled out by Company transportation agents, placed in folders by place of destination and delivered to the purser in the pouch prior to departure. The purser makes no entries on the manifests. The required number of manifest books (specified in the Cabin Service Manual) are prepared by sorting copies of the cargo manifests into an order specified in the Manual and stapling the bundle together with the General Declaration (and, if there is one, the passenger manifest) to form a "book." On MAC flights there are rarely any cargo manifests. The books are turned over to Company transportation agents upon arrival, who in turn distribute them to government personnel.

(c) *Passing out various customs, immigrations and/or quarantine forms* —these are forms which passengers are required to fill out prior to landing. The required forms for each port are placed into the pouch by Company transportation agents prior to departure, segregated for each port. The purser (and occasionally other cabin attendants) passes the forms out to the passengers, who complete and retain them to turn over to government officials after arrival. While the passenger immigration forms vary slightly from country to country, the basic information called for by the forms is essentially the same: name of passenger, address, citizenship, passport number, and address while in country. Likewise, while the passenger customs forms vary slightly from country to country, the basic information called for— goods being brought into the country which were purchased in other countries—remains the same. The forms are printed in both English and the applicable Asian language, and most are self-explanatory and/or contain written instructions on their completion. Pursers (as

well as other cabin attendants) answer passenger questions regarding such forms to the extent that they know the answers. Neither pursers nor stewardesses are responsible for knowing the answers to questions unless the information necessary to answer is contained in the Cabin Service Manual. Stewardesses know the answers to most questions. Pursers have no responsibility for completing passengers forms. Procedures with respect to passing out the passenger forms are detailed specifically in the Manual.

(d) *Making entries on certain documents*—pursers are responsible for making entries on only two government documents (other than the U. S. Customs liquor form)

    (1) General Declaration (Form 7507): most of the form is completed by Company transportation agents. The purser checks crew passport numbers for accuracy, enters the number of passengers, recites that he has sprayed the plane, and lists any passengers whom the attendants believe to be ill. The General Declaration is required only on transpacific interport flights (commercial and MAC).

    (2) Aircraft/Vessel Report (I–92): this is a U.S. immigration form used to record an aircraft's entry into or exit from the U.S. It is used only on west-bound domestic segments of international flights and on Tokyo to U.S. transpacific flights. The purser enters the name and nationality of the airline (always the same, i. e., "Northwest USA"), flight number, date, ports of arrival and departure (always Seattle, Anchorage or Honolulu, and Tokyo), ports of destination, total number of passengers, and number of passengers bound for each port. It takes fifteen or twenty sec-

onds for the purser to fill out the I–92. He turns it over to a Company transportation agent upon arrival.

62. The government documentary duties of pursers described in the paragraph above are not all required on all purser flights. Pursers perform the following documentary duties on the various types of flights on which they are (or were) used:

(a) *On pure domestic flights:* none.

(b) On the eastbound portion of domestic segments: transporting the pouch only.

(c) On the westbound portion of domestic segments: transporting the pouch, U.S. passenger immigrations form (I–94), and, during certain periods of time, Aircraft/Vessel Report (I–92).

(d) On U.S. to Tokyo flights: manifest books, passenger forms, and General Declaration.

(e) On Tokyo to U.S. flights: manifest books, passenger forms, during certain periods Aircraft/Vessel Report (I–92), and General Declaration.

(f) On interport flights: manifest books, passenger forms, and General Declaration.

63. Pursers are instructed and expected to carry-out their international documentation responsibilities during times when there is little or no passenger service. While they are engaged in these tasks, the other cabin attendants provide any needed passenger service and perform their other assigned tasks. All documentation duties are in addition to and not in place of regular passenger service duties for all cabin service personnel. Pursers are responsible and accountable for the international documentation. Pursers have not been disciplined to any greater extent or degree for failing to properly perform their tasks with respect to government documentation than have other cabin attendants been disciplined for failing to properly perform their tasks with respect to

Company and government documentation. Of all pursers employed at any time since 1965, only two have ever been suspended (one time each for a period of two days each) for improper performance with respect to government documentation, whereas stewardesses have received suspensions of greater duration for improper document work (including, for example, one 2-day and one 4-day suspension received by one stewardess, who was a witness at a trial, for failing to submit her own pay forms on time).

64. The documentary duties described which are (or were) assigned only to pursers involve no greater skill, effort or responsibility than does the documentary duties assigned to all cabin attendants. In addition the documentary duties of the purser does not make that job, in the aggregate, one requiring greater skill, effort or responsibility than the stewardess job.

65. The Company's Cabin Service Manual contains a "chain of command" during flight. The pilot is first in the chain of command, the co-pilot is second, the third member of the cockpit crew is third and the "Senior Cabin Attendant" is fourth in the chain of command. If one purser is aboard, he is denominated the Senior Cabin Attendant irrespective of his relative length of service as compared to the other cabin attendants. If two or more pursers are aboard the flight, the most senior purser is the Senior Cabin Attendant. If no purser is aboard the flight, the most senior stewardess or FSA is the Senior Cabin Attendant. On interport flights, however, the male Asian FSA (who is assigned to most interport flights) is automatically the Senior in Tourist regardless of his seniority. It is rare that the captain or other members of the flight deck crew become involved in matters pertaining to cabin service or cabin attendants although all cabin attendants are subject to the authority and direction of the captain who is completely responsible for all crew members.

66. Among the cabin attendant crew, the Company's Cabin Service Manual provides that a purser shall always be considered the senior attendant and shall coordinate the activities of the other attendants and shall be held "responsible and accountable" for conduct of service on the entire flight. Absent a purser, the cabin attendant with the most seniority shall be the senior attendant also responsible for the coordination of cabin service activities on the entire flight but accountable only for the conduct of service in that section of the aircraft in which he or she works, the accountability in the remaining section or sections being placed on the senior attendant in that section. Duty assignments aboard the flight are made by the senior cabin attendant. Pursers are always assigned to the first class section.

67. Senior cabin attendants (whether purser or stewardess) engage in the following activities in discharging their "supervisory" responsibilities:

1) Monitoring and where necessary correcting work of other cabin attendants.

2) Determining time of meal service and movie showing.

3) Moving attendants from section to section to balance work loads.

4) Give pre-departure briefings on emergency equipment and procedures.

Stewardesses who serve as Senior Cabin Attendant are subject to discipline if they fail to carry out their "supervisory" responsibilities, and are held just as accountable as pursers who fail to carry out their "supervisory" responsibilities. Stewardesses who serve as Senior in Tourist are likewise subject to discipline if they fail to carry out their supervisory responsibilities. The Company does not maintain a merit system whereby either pursers or stewardesses who "supervise" well are paid more than those who do not supervise as well. All pursers are paid on the same scale, and all stewardesses on the same scale, re-

gardless of how well or poorly they supervise.

68. The duties of each cabin attendant position are clearly defined in the Cabin Service Manual and cabin service bulletins. The Manual presents information, responsibilities, and instructions for cabin attendants in a clear and concise manner. It describes in detail cabin attendant duties, procedures and responsibilities. Each cabin attendant is required to be thoroughly familiar with all material covered in the Manual, and procedures in the Manual are expected to be followed explicitly. As cabin attendants acquire experience, they are better able to perform their duties with less need for coordination by the Senior Cabin Attendant. Relatively new attendants are less certain of their duties and how to perform them, and require closer watching and guidance than do more senior attendants. Normally, all of the stewardesses on flights on which pursers are assigned are relatively senior and experienced. The pursers' "supervisory" responsibilities therefore normally are less demanding than the "supervisory" responsibilities of stewardesses who serve as Senior Cabin Attendants on domestic flights with more junior stewardesses. Because the cabin attendants with the greatest seniority almost always elect to work in the first class cabin forcing the more junior and less experienced cabin attendant to work in the tourist class cabin, and because there are more cabin attendants in tourist class than in first class, the Senior in Tourist normally spends greater time and effort in coordinating the duties of other cabin attendants than does the Senior Cabin Attendant, on both purser and non-purser flights.

69. The Company hired, trained and promoted individuals in the purser classification with the expectation that they would exercise leadership and supervisory responsibilities immediately upon being placed as pursers. As automatic "senior cabin attendants" on all flights to which pursers were assigned, pursers are "responsible and accountable for the entire cabin service staff." Cabin Service Attendants other than pursers, who functioned on particular flights as the "senior cabin attendant" are "responsible for the entire flight" in the proper coordination of cabin service activities but "accountable" only for the conduct of service in the section of the aircraft to which assigned. In the performance of the duties of the purser and the non-purser senior cabin attendant, responsibility is synonymous with accountability. Only in the purser's formal relationship with the Company does his accountability differ from the non-purser senior cabin attendant and that difference is derived from status rather than as a function of the job. Cabin service attendants are employed to serve and protect Company passengers. The "supervisory" functions of senior cabin attendants—whether purser or stewardess—are less important than, and require no greater skill, effort or responsibility, than the other functions assigned to all cabin attendants.

70. Pursers are paid on a different and higher pay scale than other cabin service attendants. In each round of collective bargaining negotiations since at least the mid-1950's, the union proposed that stewardesses serving as Senior Cabin Attendant receive a supplement to their pay. In each instance, the Company has refused on the asserted ground that the longevity step provisions of the stewardess pay scale, which pay more senior stewardesses more than relatively junior stewardesses, together with the requirement that the most senior stewardess on a flight serve as Senior Cabin Attendant, provided added compensation for performing in that position.

71. When pursers were scheduled regularly on pure domestic flights, their duties were identical to those performed by the Senior Cabin Attendant on domestic flights without a purser. Pursers had no documentary duties on such flights which are not performed by stewardesses on other flights. When pursers were regularly assigned to do-

mestic segments of international flights (1959 through December, 1970), their duties (other than the minor documentary responsibilities previously described) were identical to those performed by stewardesses serving as Senior Cabin Attendant on non-purser domestic flights. The only respect in which the duties of the purser as Senior Cabin Attendant on transpacific and interport flights differs from those of a stewardess as Senior Cabin Attendant on non-purser flights is that pursers perform certain government documentation responsibilities. These documentation duties do not make the purser job one requiring greater skill, effort or responsibility than the stewardess job. When the Company decided to remove pursers from the domestic segments of international flights in December 1970, it made no changes of any kind in the duties assigned to, and performed by, cabin attendants on the east-bound portions of such flights. The only change made with respect to the west-bound portion of such flights was that Company transportation agents, who had "always" had "the responsibility . . . to insure that each out-bound alien has a properly completed I–94" (U. S. Immigrations form) were now assigned the additional responsibility to collect the I–94's (which pursers had previously done in flight).

72. The work of all cabin attendants on MAC flights is less demanding than on other flights. There is no class service, no liquor is served, the food service is less elaborate than that even in the tourist section of commercial flights, and the passengers are less demanding. The purser's government documentation duties on MAC flights, where there are any, are relatively minor. On the MAC flights flown out of Honolulu, on which there frequently was more than one purser assigned, and on which all cabin attendants were pursers from October 1969 through June 1970, the duties of all but the most senior purser (Senior Cabin Attendant) were identical to the duties performed by stewardesses on other MAC flights. This is also true on the occasions when more than one purser is assigned to commercial flights.

73. A substantial percentage of the Company's overall utilization of pursers consisted of their assignment to pure domestic flights or to domestic segments of international flights. Many pursers flew such flights exclusively, for months or years at a time. In December, 1970, following the filing of this lawsuit and the BRAC strike, the Company removed pursers from pure domestic flights and domestic segments of international flights. Similarly, a substantial percentage of the Company's utilization of pursers has consisted of their assignment to MAC flights. Many pursers flew such flights exclusively, for months or years at a time.

74. Until January 1971, both purser and stewardess schedules normally were constructed so that the maximum number of consecutive nights away from home on a trip during the month ranged from zero to six nights. In and after January 1971, the Company redesigned its purser schedules so that many, but not all, pursers would be away from home on a trip during the month from eight to thirteen consecutive nights. Stewardess schedules continue to be constructed so that the normal maximum number of consecutive nights away from home on a trip during the month range from zero to six, although some schedules require more.

75. Until January, 1971, purser and stewardess "nights away" working conditions were not dissimilar at all. The eight to thirteen day trips which some pursers have flown since January, 1971, do not constitute substantially dissimilar working conditions from those of other cabin attendants. More consecutive days away from home also means more consecutive days at home during the month. The preferences of cabin attendants in this regard are highly subjective—some prefer one long trip a month, while others prefer several shorter trips; some find that remaining in the Orient for several consecutive days easier on their "biological clock" than

repeated transpacific flights with frequent time zone changes. Because ground time is not counted toward flight time, purser schedules (encompassing longer flights) entail fewer actual hours of work, and fewer days away from home, than short-hop domestic stewardess schedules.

76. Although pursers have flown for many years to Manila, Okinawa, Taipei and Seoul on interport flights, the Company's schedules have never required, until 1972, that they layover in those cities. Pursers flying interport normally begin and end their day in Tokyo, flying round-trip flights to other Asian cities. From 1947 to the present date, American stewardesses regularly have had layovers in Tokyo. In 1966, the Company obtained authorization to fly to Hong Kong. At various times thereafter, the Company has constructed some purser interport schedules providing for one night layovers in Hong Kong. Those few pursers who have layovers in Hong Kong (or, recently, other Asian cities) do not have working conditions dissimilar from those of cabin attendants who do not layover in interport cities. (In addition, stewardesses flying on certain MAC flights have had layovers in interport cities.)

77. Interport flights are manned with an American purser and Asian stewardesses and FSA's (all of whom speak English). For years, substantial numbers of purser schedules were constructed so that they required no interport flying at all, and, therefore, the pursers filling such schedules did not have layovers in Hong Kong or fly with Asian cabin attendant crews. This included, *inter alia*, all pursers based in Washington, D.C. and in Honolulu. From 1952 to 1957 no American pursers at all were scheduled on interport flights. Flights flown by pursers with Asian cabin attendants pose no more difficult or different working conditions than flights without Asian attendants.

78. The job of purser and the job of stewardess require equal skill, effort and responsibility and are performed under similar working conditions.

79. The compensation of all cabin attendants is established through collective bargaining. There are two separate base salary scales—one for pursers and one for stewardesses (and FSA's). Each scale provides for longevity step increases. Pursers presently receive the top step in their sixth year as a purser, whereas stewardesses receive the top step in their ninth year. The base salary of both pursers and stewardesses is based upon 67 flight hours per month. Additional flight hours are compensated by an hourly incentive (overtime) rate (higher for pursers than for stewardesses). In addition, stewardesses who engage in "foreign flying"—defined as all flights to or from any foreign country, Alaska, or Hawaii (but excluding Winnepeg, Canada)—receive a $1.00 per hour supplement for each hour flown on such flights.

80. Pursers' salaries are, and always have been approximately 30 to 55 percent higher than those of stewardesses of equal longevity engaged in domestic flying, and approximately 20 to 35 percent higher than stewardesses of equal longevity engaged solely in "foreign flying."

81. The Company maintains records which enable it to determine what flight a given cabin attendant has flown each day, the position held each day, and the time spent by that cabin attendant each day. These records enable the Company to pay cabin attendants different amounts for different portions of their monthly service. FSA's temporarily filling purser vacancies are paid the purser rate only while flying as pursers. Stewardesses flying international receive the "foreign flying" supplement only for the hours spent on the international flight. Permanently assigned pursers receive the purser rate and those of a given longevity the same salary whether or not they are filling the purser position on the flight and irrespective of the kind of flight, domestic, foreign or interport. Except for the "foreign flying supple-

ment" all stewardesses of a given longevity receive the same salary, irrespective of the nature of the flights or the position occupied on the flight.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and over the subject matter of this action, pursuant to the provisions of the Equal Pay Act [29 U.S.C. § 206(d)] and Title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e].

2. Northwest Airlines, Inc., has discriminated on the basis of sex in willful violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1), 29 U.S.C. § 255(a), on jobs the performance of which require equal skill, effort and responsibility and which are performed under similar working conditions by:

a) Paying female stewardesses lower salaries and pensions than male pursers.

b) Providing less expensive and less desirable layover accommodations than male cabin attendants.

c) Providing · female stewardesses no cleaning allowance while providing a uniform cleaning allowance to male cabin attendants.

3. Northwest Airlines, Inc. has discriminated on the basis of sex in willful violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1), 29 U.S.C. § 255(a), by paying Mary P. Laffey a lower salary as a purser than it pays to male pursers with equivalent length of cabin attendant service.

4. Northwest Airlines, Inc. has violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), (hereinafter "Title VII"), by paying female stewardesses lower salaries and pensions than male pursers for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

5. Northwest Airlines, Inc. has violated Title VII:

a) By discriminating against females because of their sex in filling purser vacancies from July 2, 1965 to date.

b) By providing from June 15, 1967 to date that stewardesses who become pursers do not get credit for their stewardess seniority · on the purser seniority list, whereas male FSA's who have become pursers (both before and after June 15, 1967), get credit for their FSA seniority on the purser list.

c) By providing that stewardesses who become pursers do not get credit for their stewardess seniority on the purser seniority list, thus perpetuating the effects of past discrimination from June 15, 1967 to date.

d) By providing that stewardesses who become pursers are slotted at the bottom of the purser pay scale and thus receive lower salaries than male pursers with equal cabin attendant longevity, thus perpetuating the effects of past discrimination from June 15, 1967 to date.

e) By changing its procedures and standards for selecting pursers, lengthening the probationary period, denying consideration of purser bids to stewardesses who have not flown with a purser for four years, according automatic preference to junior pursers over senior stewardesses in bidding for purser vacancies, discouraging and attempting to deter stewardesses from bidding on purser vacancies, failing to post notices of all purser vacancies at all cabin attendants bases, from June 15, 1967 to date.

f) By demoting Mary P. Laffey from purser to stewardess and continuing her as a stewardess, by paying her a lower salary as a purser than it paid male pursers hired as cabin attendants subsequent to her, thus perpetuating the effects of past discrimination.

g) By imposing a "chain of command" aboard its planes under which all male cabin attendants, irrespective of

classification or length of service were superior to all female cabin attendants.

h) By forbidding only female cabin attendants to wear eyeglasses, to be without cleaning allowances, to have free choice of luggage, to have single rooms on layovers to be without weight prescriptions and weight monitoring and by imposing a shorter maximum height requirement for female cabin attendants.

6. Each of the above enumerated Title VII violations are continuing violation, and each continued during the 90 day period preceding the filing of charges with the Equal Employment Opportunities Commission and therefore, none is barred by the provisions of 42 U.S.C. § 2000e–5(d).

Judgment shall be entered accordingly.