**Margaret M. MAGUIRE, et al., Plaintiffs,**

v.

**TRANS WORLD AIRLINES, INC.; Transport Workers Union of America, AFL–CIO; Air Line Stewards and Stewardesses Association, Local 550, Transport Workers Union of America, AFL–CIO; Local 551, Transport Workers Union of America, AFL–CIO, Defendants.**

**No. 70 Civ. 3947 (IBW).**

United States District Court, S. D. New York.

April 5, 1982.

As Amended May 10, 1982.

Cornfield & Feldman, Chicago, Ill., Gerald E. Paley, New York City, for plaintiffs; Gilbert Feldman, Chicago, Ill., of counsel.

Poletti, Freidin, Prashker, Feldman & Gartner, New York City, for defendant Trans World Airlines, Inc.; Herbert Prashker, Eric D. Witkin, Ronald Younkins, Carmel P. Ebb, Nathan Leventhal, Peyton H. Moss, New York City, of counsel.

O'Donnell & Schwartz, New York City, for defendants Transport Workers Union of

America, AFL–CIO, Air Line Stewards and Stewardesses Ass'n, Local 550, Transport Workers Union of America, AFL–CIO, Local 551, Transport Workers Union of America, AFL–CIO; Asher W. Schwartz, New York City, of counsel.

## OPINION

WYATT, District Judge:

This is the decision after trial to the Court without a jury of a claim by the plaintiffs named in the caption of a second amended complaint, and by others who became plaintiffs by the filing of written consents, under the Equal Pay Act of 1963 (29 U.S.C. § 206(d); sometimes referred to as the "Equal Pay Act", or "the Act").

Defendant Trans World Airlines, Inc. (TWA) is an air carrier of passengers and cargo. This action relates to passenger traffic which TWA flies on international routes between points in the United States and points in foreign countries and on domestic routes between points in the United States.

Plaintiffs are female cabin attendants employed by TWA. Their contention is that there was a violation of the Equal Pay Act in that TWA paid the female cabin attendants (who serve on both domestic and international flights) less than TWA paid male pursers (who serve only on international flights) for work said to be substantially the same. TWA has employed both male and female pursers since May 24, 1968. TWA has employed both male and female cabin attendants since December 3, 1970.

There will be judgment for defendant TWA.

### A. PROCEEDINGS IN THE CASE AT BAR

#### 1.

The action was commenced on September 10, 1970. There were twelve female plaintiffs. TWA was the only defendant.

The complaint was not separated into counts but there were two claims made, one under the Equal Pay Act and the other under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.; usually referred to as "Title VII"). As will be seen hereafter, the claim under Title VII was dismissed, on a motion by TWA for partial summary judgment, as untimely commenced.

Only the claim under the Equal Pay Act remained for trial and decision.

#### 2.

On October 26, 1970, TWA moved to dismiss the action for failure to join an indispensable party, said to be Local 550, Air Line Stewards and Stewardesses Association, Transport Workers Union of America, AFL–CIO. This local union is sometimes referred to as "Local 550" and sometimes is referred to as "ALSSA"; its national or parent union is usually referred to as "TWU". The point made by TWA in its motion was that Local 550 was the certified collective bargaining representative of cabin attendants and pursers, that collective bargaining agreements had been made between Local 550 and TWA, that the wage differentials and other claimed discriminatory practices were provided for in those agreements, that TWA could not unilaterally change these provisions, and that this situation made Local 550 (as a contracting party) an indispensable party defendant. It may be noted in this connection that when plaintiff Maguire made charges of discrimination under Title VII to the Equal Employment Opportunity Commission (EEOC) she charged Local 550 as well as TWA. The decision of EEOC was that the "charges are true as against the Union [Local 550], as well as the Company [TWA]".

On December 10, 1970, Local 550 filed a notice that it would present a petition to intervene in the action. On December 15, 1970, such a petition was presented to Judge MacMahon, intervention being sought as a plaintiff. The lawyers acting for Local 550 were the same lawyers who had signed the complaint filed by the twelve individual plaintiffs to commence the action. On the same day, Judge Mac-Mahon by endorsed order granted interven-

tion as plaintiff to Local 550, believing (mistakenly) that TWA was not opposed.

Realizing that Judge MacMahon had misunderstood its position, TWA on December 24, 1970, filed notice of a motion for reargument, making clear that, while TWA did not oppose intervention by Local 550, it urged that Local 550 should be joined as a party *defendant*, not as a party plaintiff.

By endorsed order, filed January 12, 1971, Judge MacMahon denied the motion of TWA to dismiss the action for failure to join an indispensable party. His reasoning was that since Local 550 had now been joined as a party, even though as plaintiff, there was no longer any basis for the motion.

By order with memorandum opinion, filed February 16, 1971, Judge McMahon granted the motion of TWA for reargument and on reargument ruled against TWA and for the second time granted the petition of Local 550 to intervene as a party plaintiff.

### 3.

On March 8, 1971, TWA filed its answer, which contained a counterclaim against Local 550, asserting that, since the acts complained of were done under agreements with Local 550, there was a right of contribution in TWA from Local 550 in respect of any liability imposed on TWA as a result of those acts agreed upon with Local 550.

### 4.

Meanwhile, on October 9, 1970, a related action had been commenced in this Court. This was *De Figueiredo v. TWA*, (70 Civ. 4421). De Figueiredo was a male purser who complained that male pursers were being subjected to discrimination by TWA in favor of female cabin attendants.

On April 27, 1971, De Figueiredo filed notice of a motion to consolidate his action (70 Civ. 4421) with that of Maguire (70 Civ. 3947) because the two actions involved "a common question of law or fact". Fed.R. Civ.P. 42(a).

On June 4, 1971, an affidavit was filed by TWA opposing the motion to consolidate. The point made was that Local 550, an indispensable party defendant, was not a party to the *De Figueiredo* action.

On June 7, 1971, counsel for De Figueiredo filed an affidavit requesting the Court to join Local 550 as a party defendant in his action.

In an opinion filed December 29, 1971, 55 F.R.D. 44, Judge Lasker granted the motion of De Figueiredo to consolidate the two actions and to add Local 550 as a defendant to the *De Figueiredo* action. An order on this opinion was filed on February 24, 1972.

### 5.

By order with memorandum opinion filed April 4, 1972, Judge Metzner granted a motion of the *Maguire* plaintiffs to serve an amended complaint adding averments appropriate under local rules for class actions.

On April 4, 1972, Judge Metzner filed an opinion (55 F.R.D. 48) granting a motion to determine that *Maguire* was a class action under Fed.R.Civ.P. 23(b)(2) in respect of the claim under Title VII. In respect of the claim under the Equal Pay Act, it was ruled that no determination under Rule 23(b)(2) would be appropriate because the statute itself provided for the procedure of filing written consents for participation by others in the action.

### 6.

Up to May 3, 1972, as to criminal cases, and up to July 1, 1972, as to civil cases, this Court was governed by the Master Calendar System as to the handling of its pending cases. Effective on the dates just given, this Court by Rule adopted the Individual Assignment System for the handling of its cases. At some time shortly after July 1, 1972, the consolidated action was assigned to Judge Ryan for all purposes.

Some time prior to August 18, 1972, the *Maguire* plaintiffs served, but did not file, an amended complaint.

On August 18, 1972, TWA filed its answer to the amended complaint in the *Maguire* action, with counterclaim against intervening plaintiff Local 550.

On January 17, 1973, an order of Judge Metzner was filed that the Maguire action be maintained as a class action under Title

VII. (This had earlier been decided in an opinion filed April 4, 1972.)

On November 19, 1973, the amended complaint of the *Maguire* plaintiffs (which had been served much earlier) was filed.

The docket sheet shows that on January 24, 1974, the Clerk's Office mailed notices to counsel that the two actions consolidated had been reassigned from Judge Ryan to me.

#### 7.

The unions involved in this action should be briefly described. Air Line Stewards and Stewardesses Association, International ("ALSSA") was the original bargaining representative for TWA flight attendants and since about 1961 ALSSA has been affiliated with TWU, the international union, as its Local 550. In March 1974, TWU chartered Local 551 and later in the same year Local 551 succeeded Local 550 as the representative of flight attendants employed by TWA. When this occurred, Local 550 became, and remains, inactive.

After arguments heard on February 7, 1975, and April 24, 1975, an order was filed on May 16, 1975, which made a number of significant procedural changes.

The two actions which had been consolidated were severed and it is the *Maguire* action *only* with which we will hereafter be concerned.

Local 550 was realigned and made a party defendant; Local 551 and TWU were joined as additional parties defendant. The *Maguire* plaintiffs were required to serve a second amended complaint naming TWA, Local 550, Local 551, and TWU as defendants but were not required to state claims against Local 550, Local 551 and TWU.

#### 8.

On May 30, 1975, the *Maguire* plaintiffs filed a second amended complaint. This stated the same claims against TWA as had been stated before. There were named as defendants, in addition to TWA, the unions—Local 550, Local 551, and TWU—but no claim was stated against the unions.

On July 2, 1975, TWA filed an answer to the second amended complaint with eigh-teen separately stated defenses. The answer contained a counterclaim against the plaintiffs, a cross-claim against defendants TWU and Local 550, and a separate cross-claim against defendant Local 551. The counterclaim and cross-claims asked for judgment over for TWA in the event TWA was held liable to plaintiffs.

On July 14, 1975, plaintiffs filed a reply to the affirmative defenses in the answer of TWA.

On July 14, 1975, plaintiffs filed an answer to the counterclaim in the answer of TWA.

On July 30, 1975, TWU, Local 550, and Local 551 filed a joint reply to the cross-claims against them in the answer of TWA.

On August 4, 1975, plaintiffs filed an amended reply to the counterclaim in the answer of TWA.

#### 9.

On September 8, 1975, TWA filed notice of motion for partial summary judgment dismissing for want of jurisdiction the Title VII claim in the Second Amended Complaint.

#### 10.

The trial began on September 16, 1975, and continued on September 17, 18, 19, 23, 24 and 25, 1975. The trial was then adjourned.

#### 11.

On September 29, 1975, there was oral argument on TWA's motion for partial summary judgment dismissing the Title VII claim.

On November 5, 1975, an opinion was filed granting the TWA motion to dismiss the Title VII claim. This opinion is reported at 403 F.Supp. 734. The possibility of an interlocutory appeal (28 U.S.C. § 1292(b)) was suggested in the opinion so that a decision of the Court of Appeals could be secured for guidance before the trial was resumed.

On November 24, 1975, the Court was advised that counsel were preparing a stipulation that by agreement there would be

no interlocutory appeal from dismissal of the Title VII claim and that the trial proceed on the Equal Pay Act claim only.

On the basis of a stipulation of counsel for all parties, dated December 29, 1975, and filed January 9, 1976, an order was filed January 27, 1976, dismissing the Title VII claim, but no final judgment was entered and no interlocutory appeal was possible (nor was desired by any party).

### 12.

The trial resumed on June 1, 1976. The period of trial recess was affected by other engagements of counsel and of the Court and the June 1, 1976 date was finally a matter of agreement. The trial continued on June 2, 3, 4, 7, 14, 15 and 16. The trial was concluded on June 16, 1976.

Post-trial briefs were exchanged in October 1976 and reply briefs were exchanged in November 1976.

## B. THE ISSUE IN THE CASE AT BAR

### 1.

The issue is whether TWA has violated the Equal Pay Act. On its face the Act is simple. It forbids an employer to "discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions ..." (29 U.S.C. § 206(d)).

### 2.

The issue is raised in respect of the differential between the pay of pursers (higher) and that of hostesses, later called cabin attendants (lower).

From the beginning of TWA international flights, stipulated to have been on February 5, 1946, pursers have been employed by TWA on such flights. Until May 24, 1968, all pursers were male. On August 8, 1967, a contract was signed between Local 550 and TWA which (in Article 13(G)) opened the position of purser to females by giving priority in filling future purser vacancies to hostesses in order of hostess seniority. The first TWA female pursers began work May 24, 1968.

Until an agreement signed October 22, 1970, between Local 550 and TWA all hostesses on both domestic and international flights were female; by the described agreement, males could be employed in that classification, the name of which was changed to "cabin attendant" to embrace both male and female. The first TWA male cabin attendants began work on December 3, 1970.

In an action in a federal court in Florida, it had been held that it was not a violation of Title VII for an airline to refuse to hire males as cabin attendants. *Diaz v. Pan American World Airways, Inc.*, 311 F.Supp. 559 (S.D.Fla.1970). This decision was reversed by the Court of Appeals on April 6, 1971 (442 F.2d 385; 5th Cir., *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971)). TWA apparently waited until the end of the *Diaz* litigation before hiring males in any numbers as cabin attendants.

A letter agreement, dated February 4, 1970, between Local 550 and TWA, provided for a "service manager" classification on some international flights, those using B-747 (wide-bodied) planes. After the February 4, 1970, agreement, a "service manager" classification was also added on TWA domestic wide-bodied flights.

### 3.

There are two pay differentials which figure in the issue here.

There is a pay differential between cabin attendants on international flights (higher) and cabin attendants on domestic flights (lower). Plaintiffs appear to accept this differential as lawful and appear to concede that the work of domestic and international cabin attendants is not "equal work".

The other and more important (for this action) pay differential (the "purser differential") is between cabin attendants on international flights (lower) and pursers (higher).

Plaintiffs are seeking to require TWA to pay the amount of the purser differential for the relevant period to all plaintiff international cabin attendants and also to all plaintiff domestic cabin attendants.

## C. CHRONOLOGY OF THE PURSER DIFFERENTIAL

### 1.

TWA began domestic commercial passenger flights in about 1935. At the beginning the cabin service was supplied only by female hostesses.

### 2.

TWA began international commercial passenger flights in 1946. The purser position (filled initially only by males) began then and has continued ever since.

Until about 1960 the TWA planes were piston types, flying slower and carrying fewer passengers than present-day jets. On piston planes the usual cabin crew for international flights was one purser and one hostess. On some international flights there were seats convertible to sleeping berths; on these flights *two* pursers were assigned by reason of the heavier labor involved in berth conversions.

### 3.

When TWA began international flights in 1946, Pan American Airways (Pan Am) was already operating international flights; Pan Am had no domestic flights. Pan Am employed males and females for cabin service on its international flights and also had the job classification of purser, in which it also employed males and females.

The example of Pan Am substantially influenced TWA when it began international flights because Pan Am was its chief competitor, had many more flights, and more experience with international flights.

A local union of TWU was bargaining agent for Pan Am cabin attendants and for Pan Am pursers. The first Pan Am union contract was made in 1946. Pan Am and the union were able to agree on the job classifications but not on the rates of pay. The rates of pay were the subject of arbitration, the arbitrators including then Professor, later Circuit Judge, Paul R. Hays. The arbitrators fixed the rates of pay and determined that pursers should be paid more than cabin attendants. This established a purser differential at Pan Am some 30-odd years ago and had nothing to do with sex, because both jobs were performed at Pan Am by both sexes.

The first contract between ALSSA and TWA was executed on May 29, 1947. This followed the pattern of the 1946 Pan Am contract, which was well known to the negotiators on both sides at TWA. There were separate purser and hostess job classifications and there was a higher rate of pay for pursers. Although pursers at TWA were all males, the purser differential was not based on sex but rather was strongly affected by the example of Pan Am. Both at Pan Am and at TWA the purser differential was a recognition of the different and additional work performed by pursers. The purser differential was smaller, however, in the TWA contract than in that for Pan Am. A purser differential in some amount was forced on TWA by the pressures of union negotiators, among whom hostesses took a chief, if not controlling, position. The TWA hostesses were, of course, primarily interested in *their* rate of pay; this was the principal issue, because the number of pursers was, and continues to be, relatively small. For example, at the time of trial there were 179 pursers, 1,063 international cabin attendants and 3,462 domestic cabin attendants. If the large group of cabin attendants got a satisfactory rate of pay, a small extra amount to the relatively few pursers was, in the eyes of hostesses, justified and of no great consequence.

The TWA policy of hiring males only for the purser position was in part an accident of history.

The position of purser at Pan Am could be filled by promotion of both males and females from cabin attendant, since Pan Am had male and female cabin attendants. By contrast, TWA employed only female cabin attendants and thus could not obtain by promotion a mix of male and female

pursers. TWA had earlier flown internationally under contract to the military services of the United States and on the military flights had used male cabin attendants. These became the first group of TWA pursers. The operating officials of TWA believed that some men were needed for some of the extra duties of purser, such as berth conversions and the handling of heavy liquor kits.

TWA and ALSSA negotiated a second agreement, signed June 29, 1948. This was influenced by an earlier Pan Am agreement with its union, which in turn followed an arbitration before Chairman David L. Cole and other arbitrators. The arbitration Award fixed separate job classifications at Pan Am for pursers and cabin attendants, fixed higher pay for pursers, and increased the dollar amount of the purser differential. The TWA purser differential continued to be smaller than that of Pan Am.

TWA and ALSSA continued the purser differential in contracts made on November 18, 1949, on April 6, 1951, on August 20, 1952, on March 16, 1954, on February 17, 1956, and on February 1, 1958. These were affected by and in the same pattern as union contracts by Pan Am, as to one of which (dated April 14, 1952) there was a recommendation of higher pay for pursers than for cabin attendants by a Presidential Emergency Board under the Railway Labor Act.

### 4.

In about 1960, jet planes began to replace piston planes and TWA introduced B-707 jet service. For the early period of this service, a TWA international flight attendant crew consisted of two pursers and four hostesses. Later, this crew complement was changed to one purser and four or five hostesses.

### 5.

There was a strong effort by ALSSA in 1960 to secure the same pay rates for TWA flight attendants as those paid by Pan Am. ALSSA and TWA were unable to reach an agreement and so submitted to binding arbitration. The arbitration Award (among other things) continued the purser differential.

The arbitration Award did not satisfy the flight attendants, principally because pay was still below that at Pan Am and, at least as believed by pursers, there was not sufficient recognition of the additional duties of pursers. There was a work stoppage on a weekend just before Monday, July 4, 1960. Nonetheless, the Award was made part of a contract signed by TWA and ALSSA on July 11, 1960.

Dissatisfaction of the flight attendants continued and an agreement was finally made for TWA to pay more money to hostesses and to pursers. This agreement was signed March 30, 1961. As to pursers, a special payment was to be made of 50¢ per hour of flight time. This special payment is usually called the purser "override" and has continued since first paid, except that it was gradually increased to $1.00 per hour.

### 6.

The next agreements by TWA with Local 550 were made on January 25, 1963, on February 27, 1965, and on August 8, 1967 (ALSSA in 1961 had become Local 550 of TWU). These agreements are all shown to have been substantially affected by Pan Am contracts on the same subject matter made during the same time periods.

The major effort of Local 550 was to secure parity in pay with Pan Am employees. Although the pay rates in TWA contracts did remain below those for Pan Am employees, the TWA purser differential *increased* in each contract as a result of union proposals. In point of fact, the union proposed to increase the purser differential by amounts larger than those proposed by TWA and larger than those to which TWA could, and at some point did, agree.

A significant change (already noted) was made in the August 8, 1967 agreement. It was then that the purser position was opened to females by providing that future purser vacancies must be filled first by bids of "qualified Hostesses".

### 7.

After the 1967 agreement, the chief representatives for plaintiffs, especially plain-

tiffs Maguire and Nelson, began to plan for the negotiation of the next union contract. This planning included the circulation among hostesses of a petition to Local 550 regarding points to be included in the new contract proposals.

This petition is evidence of a recognition by plaintiffs, at a time near the commencement of this action, that the purser differential at TWA was not, and is not, based on sex but is based on the additional work demanded by the job of purser. The petition is thus inconsistent with the claim in the complaint. The petition defined "purser" as follows:

> "Purser" means an employee who provides or assists in providing service to passengers while in flight, and whose work includes performing and assisting in performing all enroute cabin service, attending to passenger comfort, responsibility for the preparation and completion of passenger, crew, and cargo manifests enroute, and other reports as required by the Company or by law, and responsibility for the money collected from the passengers.

The petition urged that pursers and cabin attendants be paid the same basic rate but that the purser be paid an extra amount, as follows:

> In addition to the rates of pay as outlined above the purser shall be paid $2.50 for each hour flown or fraction thereof . . . .

The petition was sent with a covering letter which said (among other things) that all cabin attendants should be paid the same basic rate but that the purser should be paid an additional sum:

> We are all cabin attendants and should be working at the same salary rates, except for the one person [the purser] in charge of cabin service who should receive slightly more.

The proposal to pay $2.50 per hour extra to pursers would have increased the purser differential above that then being paid.

The petition was strongly supported by the plaintiffs in this action, was supported by the female hostesses generally, and three of its four proposals were made by Local 550 at the start of the 1970 negotiations.

8.

The proposals of Local 550, in the negotiations which led up to the October 22, 1970, agreement, seem (as in many other negotiations) inconsistent with the claim that extra pay for pursers violates the Equal Pay Act. When this action was commenced on September 10, 1970, Local 550, *with the support of plaintiffs*, was then asking for increases which would have added to the dollar purser differential. The increases would come about because of the increase in pay of cabin attendants, the most numerous class of employees. This would, however, necessarily affect the pay of pursers since purser pay was an addition to cabin attendant pay. TWA resisted, and Local 550 called a strike. This strike began at midnight, October 19, 1970. The strike continued until about 1:00 a. m. on October 21, 1970.

The agreement which ended the strike represented an acceptance by TWA of uniform percentage increases for pursers and cabin attendants. This agreement, which increased the dollar purser differential, was embodied in the contract dated October 22, 1970.

9.

Before another agreement could be reached by Local 550 and TWA, there was another strike by Local 550 against TWA. This time the strike was much longer, lasting from November 5, 1973 to December 14, 1973. The agreement which ended the strike was dated December 14, 1973, and was an acceptance by TWA of the union demand.

The issue which caused the strike in 1973 was the same as that which caused the strike in 1970. It was the insistence by Local 550, which means also the plaintiffs in this action, that there be a uniform percentage increase paid to international cabin attendants and to pursers. This would necessarily increase the difference in dollars between the pay of pursers and cabin attendants. Since the plaintiffs are demanding in the case at bar that cabin attendants be paid the same rates as paid to pursers,

an increase in the pay of 200 or fewer pursers would mean a huge increase in the claim of some 4,500 plaintiff cabin attendants in the case at bar. The position of TWA was thus not an enviable one. If it accepted the demands of the unions in the contract negotiations, it violated—according to plaintiffs—the Equal Pay Act; if TWA refused the demands of the unions to increase the purser differential, the union—with the support of plaintiffs—would call a strike against it. TWA refused the union's demands and suffered the strike, but finally had to accept the union demands and had to increase the dollar purser differential. This was the result contained in the agreement of December 14, 1973.

### 10.

Negotiations for the last of the relevant collective bargaining agreements began in April 1975. By that time, Local 551 TWU had taken the place of Local 550 TWU as bargaining representative for cabin attendants and pursers.

The initial proposal of Local 551 was a 30% pay rate increase for all job classifications and an increase to $2.00 per hour in the purser "override". This would have increased the dollar purser differential in the same manner as in the 1970 and 1973 contracts.

Negotiations for a new contract went on during the trial and a contract was signed (subject to ratification) in June 1976 between TWA and Local 551. This contract provided for a uniform percentage increase in pay for international cabin attendants and pursers and a different increase for domestic cabin attendants. The effect was that, even as the claim of an Equal Pay Act violation was being tried, Local 551 and plaintiffs were insisting on an increase in the purser differential here claimed to violate that Act.

### 11.

At the time of trial, there were some 200 pursers—male and female—and some 4,500 cabin attendants—male and female. The proportions in numbers between the pursers and cabin attendants was substantially the same at all relevant times.

As might be expected from the history of the matter, the vast majority of cabin attendants were female and since they and the pursers had the same bargaining representative, females at all relevant times dominated the union organization and controlled the negotiations with TWA. The named plaintiffs in this action were principal figures in Local 550 and Local 551 and in all matters relating to the purser differential. They were members of Master Executive Councils of Local 550, were members of negotiating committees, were active in the preparation of proposals to TWA, and sometimes signed the contracts negotiated with TWA.

The named plaintiffs and the majority of all female cabin attendants voted to strike against TWA on at least two occasions in order, among other things, to maintain and increase the payment of a higher amount to pursers by TWA than to cabin attendants. The named plaintiffs and the majority of all female cabin attendants approved and ratified agreements made by the collective bargaining representative with TWA which required TWA to pay the higher rate to pursers which is in this action claimed to be a violation of the Equal Pay Act. The acts of the majority of the female cabin attendants and of the named plaintiffs have been at all times inconsistent with the claims advanced by plaintiffs in this action.

### 12.

The named plaintiffs and a majority of the female cabin attendants of TWA have at all times, by their acts as set out above, recognized that the work of cabin attendants is not equal work on a job which requires skill, effort, and responsibility equal to that of pursers.

## D. THE DIFFERENT AND ADDITIONAL WORK PERFORMED BY PURSERS

### 1.

TWA has a Flight Service Manual which specifies in detail the duties and responsibilities of flight attendants. These Manuals

change in some respects from time to time. The changes are required by changes in equipment and by other causes. Plaintiffs put in evidence a Manual dated April 4, 1972; TWA put in evidence several Manuals of different dates.

The Manual in use at any given time makes it clear that (except as to B-747 "Service Manager" flights, about a third of the total) the purser is "in charge" of all cabin services for all passenger classes. The purser is referred to as "Purser-in-Charge" so as to include the situation where more than one purser is assigned to a flight and the senior purser is the "Purser-in-Charge". The Manual states, among other things, that the purser is "responsible to see that all in-flight services meet Company standards" (the quotation is from the Manual introduced by plaintiffs). The Manual shows that the purser, as distinguished from cabin attendants, has authority, responsibility, and accountability. The purser is the leader, the coordinator, the supervisor of the flight attendants. The Manual, in its numerous details, fully reflects the extra dimension of purser duties. The parties have stipulated that the "general policies and regulations of TWA" are "authoritively [authoritatively] stated" in the Manual; that "information, responsibilities and instructions" are presented in the Manual "in a clear and concise manner"; that all flight attendants are "required to be thoroughly familiar with all material covered in" the Manual; and that TWA "expects the procedures" of the Manual "to be followed by all flight attendants".

TWA emphasized leadership as a purser quality and purser training included courses in leadership; TWA cabin attendants did not receive training courses in leadership.

At least since 1951, the collective bargaining agreements have required that a purser must be "designated as being in charge of cabin service" (quoted from Art. 2(C) of the October 22, 1970, agreement).

### 2.

The purser is responsible for dealing with the TWA Commissary on the ground before flights to be sure that the aircraft is provi-sioned correctly. This requires a check with cabin attendants working the galleys and requires that any missing items be obtained.

### 3.

The purser is responsible for checking on the ground before flights the estimated time of departure and is responsible for obtaining the "emergency chart for flight attendants' signatures" (Manual, April 4, 1972, p. 05.01.01).

### 4.

The purser is responsible for determining beforehand what TWA and government forms (as, for example, customs and immigration forms) are needed for the particular flight and for obtaining these on the ground. All the forms are important, because of the possibility of inconvenience to passengers or of fines to TWA. There is also the possibility of difficulties for the TWA crew because it is the responsibility of the purser on each flight to see that all flight crew members receive customs crew declaration forms.

### 5.

It is the responsibility of the purser, on the ground and well in advance of the Captain's briefing of the crew, to find the Captain and advise him of the in-flight services to be offered, of the times (more or less) of the services, of the names and numbers of cabin attendants, and of the positions they will be working. It is also expected that the purser will secure all pertinent last-minute information from the Captain as to cabin conditions expected on the flight.

### 6.

It is the purser, as the leader, who conducts a briefing of cabin attendants before each flight. This is an important supplement to any briefing by the Captain of the entire crew, a briefing in which the Captain would focus on such things as time of flight, altitude, expected weather, traffic patterns, any unusual conditions, and any possible stops.

Following such a briefing by the Captain, it is the duty of the purser to conduct on his own responsibility a briefing of all cabin

attendants. This requires a review by the purser of in-flight services and the time of services on the flight; of any late changes in the flight information or in Manual procedures; of the passenger load; of the positions to be worked by each cabin attendant and, in case of conflict between wishes of attendants, an assignment by the purser of cabin attendants to positions; and of any special instructions by the purser to cabin attendants, including designation of the person to make the second (or foreign language) cabin announcement (either the purser or some qualified cabin attendant). During the briefing by the purser, safety regulations are reviewed and emergency procedures sheets are certified for the equipment being flown. The briefing by the purser occupies about fifteen minutes; at the beginning of a crew month assignment, more time might be required because of newness of the personnel combination and later, as routine develops, the time period may be shorter.

The purser briefing is treated as significant by TWA and if not properly performed, at the least a written reprimand is given to the purser.

### 7.

The purser has always been required by TWA to have much greater skill in foreign languages than cabin attendants.

From 1948 to 1960 TWA hired as pursers only those who could speak at least one foreign language. From 1960 to 1965 TWA required that pursers speak fluently one foreign language and also have knowledge of another foreign language. Since 1965 TWA has required that applicants for the purser position possess qualification in two foreign languages.

Since its agreement with Local 550 of October 22, 1970, TWA has had no language requirement for any female cabin attendant who was hired as such before January 1, 1959, and who applied to become a purser.

Before 1959, there was no language requirement for international cabin attendants; they were transferred from domestic operations on the basis of seniority. From 1959 to 1970, a transfer from domestic to international operations required that a cabin attendant have knowledge of one foreign language. Since the October 22, 1970 agreement between Local 550 and TWA, there has been no foreign language requirement for international cabin attendants.

There has never been any foreign language requirement for domestic cabin attendants.

The purser has the responsibility for, and makes all announcements in English to cabin passengers. The announcements include arrivals, departures, safety matters, and emergencies.

A TWA purser may be qualified in the language of destination. If so, the purser makes the announcement in the language of destination. If the TWA purser is not qualified in the language of destination, and if a cabin attendant is qualified in that language, the purser will designate the cabin attendant to make the language of destination announcement. If there is no cabin attendant who speaks the language of destination, then the announcement in that language cannot be made.

### 8.

The purser has the responsibility, and has the necessary authority, to reassign cabin attendants during flight from one position to another. The purser exercises this authority when good service demands so require, for example, when passenger load by classes is off-balance.

Cabin attendants are normally allowed to select the positions they will work by order of seniority. Selection by seniority yields, however, when the purser determines that reassignment is necessary for the reasons stated.

The reassignment authority of the purser, reflected in the Manual, was confirmed in 1970 when there was a grievance by Local 550 because of reassignment by a purser of a cabin attendant from first class section to economy section. There was a tie vote in the Board of Adjustment and a neutral member was called in. The grievance was then adjusted by an oral agreement be-

tween Local 550 and TWA which involved, among other things, an amendment to the relevant section of the Manual so that it would read, as it now does read, as follows:

Recognition of work positions by seniority bid preference will prevail. However, whenever an excessive passenger imbalance exists between F/C and Economy, or service requirements justify the reassignment of cabin attendants, the senior purser has the authority and responsibility to make adjustments necessary to provide the best possible service to all passengers.

9.

The purser is responsible for completion and proper delivery of all United States and foreign government forms and reports required from TWA and all forms and reports required by TWA from the flight crew. While this is apparently not as burdensome as in former years, the burden remains significant.

Examples of government forms and reports are those required for customs and immigration (individual passengers are, of course, responsible for completing their own forms, distributed to them by the purser). Examples of TWA forms are the "Alcoholic Beverage, Cigarette, and Earset Report", the "In-flight Duty Free Program Sales Report", the "In-flight Motion Pictures" report, the "Purser Check-out Envelope", food reports, and the passenger weight slip (the purser is responsible for counting the passengers and giving the information in writing to the Captain, with positions of passengers by number). To complete some of these forms and reports requires that an inventory be taken by the purser (notably, for instance, of liquor).

Whenever the plane lands in a foreign country, the government of that country requires forms showing the authority for that plane to land and depart. This "general declaration" contains information as to the number of passengers, illness on board, whether the plane has been sprayed for insects, and other such information. These forms are contained in a "plane pouch" which is received by the purser from a ground agent of TWA, are completed by the purser, and are kept in the custody of the purser. The plane pouch forms, in effect, constitute a "passport" or "visa" for the plane and its contents to enter and leave foreign countries.

At one time, TWA made an unsuccessful attempt for a short period to obtain help for the purser from one of the cabin attendants in the inventory of liquor and completion of some food and earset reports. A bulletin in 1969 from a TWA airport manager directed such help. Local 550 filed a grievance and a grievance "fact sheet" was signed by plaintiff Maguire as an official of Local 550. This fact sheet contains the following paragraph:

Our contract contains a job description for the hostess as well as a job description for the purser. Precedent on International also has established the different duties of a purser and a hostess. The above bulletin is now trying to change this prior to our contract negotiations. Hostesses wish to be paid for these additional responsibilities.

This seems a recognition by plaintiffs of the different work performed by pursers and of the entitlement of the purser to extra pay for at least part of the purser's "additional responsibilities". Elsewhere in the fact sheet, plaintiff Maguire referred to the work of the purser for which TWA was then seeking help and emphasized: "This is purser responsibility".

10.

The purser is responsible for turning in to TWA at the end of the flight, not only the records of all sales of liquor and other items, but the currency received from all such sales, showing in the records the conversion of foreign currencies into domestic. This requires the purser, after arrival and completion of on-board duties and deplaning and completion of customs and immigration entries, to go to the domicile station TWA office where the sales account "must be balanced in full", after which the purser must "obtain receipt". The amount of

money involved is between $400 and $600. The purser is responsible for this money in flight and at any intermediate stops. The procedure for the purser to turn in the money was, as one of the plaintiffs testified, "rather complicated" and carrying the money was a "serious responsibility".

## 11.

The different and additional work performed by pursers is by definition not work performed by the plaintiff cabin attendants. The responsibilities of the purser are exclusive to that job. TWA holds the pursers accountable for the discharge of those responsibilities.

There is an example illustrating that TWA holds the purser to a higher degree of accountability that it does cabin attendants. In Rome in 1974 there was a work stoppage by Europe-based TWA flight attendants and picket lines were established. Two TWA flights (one B-747 and one B-707) with United States-based flight attendants arriving in Rome had to be cancelled at Rome because 19 flight attendants from the two TWA flights refused to cross the picket lines. TWA then suspended these 19 employees (which included one service manager and two pursers) from their employment. Local 550 filed a grievance, which was taken to arbitration before a neutral arbitrator. TWA then proposed to reinstate the cabin attendants but insisted on discharging the two pursers and the service manager on the ground that they (the two pursers and the service manager) were responsible for seeing that the 16 cabin attendants reported for duty on the aircraft. The neutral arbitrator agreed that the cabin attendants should be reinstated but he ordered further suspension for the two pursers and the service manager, rather than discharge. The theory of TWA and of the neutral arbitrator was that the pursers (and service manager) were given higher responsibilities than the cabin attendants and therefore should be held to a higher standard of accountability.

## 12.

The purser on B-707 jet aircraft on international flights (where some two-thirds of purser flying is done) does work different from, and additional to, the work of cabin attendants. The discussion, however, should not lead to any conclusion that this additional and different work is the *only* work of the purser. A substantial part of the purser's work is of the same type as that of the cabin attendants—assisting passengers generally, serving food and drinks, and the like.

As has been indicated before, on wide-bodied aircraft for international flights—the B-747—there is a different situation. The B-747 is a much larger plane, carries many more passengers, and requires many more cabin attendants. TWA, which introduced the B-747 in 1970, wanted to carry on it one purser, to be known as Chief Purser, who would perform only *supervisory* functions and would not take part (as on the B-707) in the performance of passenger service functions. In negotiations with Local 550, however, TWA was unable to secure agreement with this concept. TWU had already made an agreement with Pan Am for a Service Director and two pursers to be carried on Pan Am B-747 planes. At the insistence of Local 550, TWA had to agree to employ on the B-747 a Service Manager and a purser and this has been done.

On B-747 planes, the purser does not perform supervisory functions and thus his work is not as different in degree from that of cabin attendants, or as demanding as on the B-707. This is not the result of any decision by TWA, however, but is rather the result of a decision by the plaintiffs themselves and of their labor organization. The situation on the B-747 does not affect any of the conclusions reached herein.

## 13.

After the August 8, 1967, agreement with Local 550 opened the TWA purser position to females, with a priority to qualified female cabin attendants, the position did not attract a sufficient number of female cabin attendant applicants to fill the purser vacancies. Most of the female cabin attendants preferred to remain in that position rather than to take the higher paying purser position. It is shown that from August

8, 1967, to August 1, 1975, of all purser vacancies and despite the priority granted to female TWA cabin attendants, 64.5% of the vacancies were filled by newly-hired persons or by female cabin attendants involuntarily assigned as pursers.

There were on January 1, 1976, a total of 161 females in the employ of TWA who had been hired as hostesses before 1959. As has been seen, if a TWA hostess was hired before 1959 she could become a purser without any language qualification. This was agreed to by TWA with Local 550 as part of the October 22, 1970, agreement. These hostesses were then eligible to become TWA pursers for the asking at any time after October 22, 1970, without any language qualification. They did not all become pursers, however. Most of them preferred to remain as cabin attendants. It is shown that of the 161 eligible females, 51 became pursers or service managers and 109 preferred to remain as cabin attendants, despite the higher purser pay.

It is of further interest to note that of the 109 female cabin attendants who, after October 22, 1970, could have become pursers without a language qualification (and could have become a purser after August 8, 1967, with a language qualification), 53—almost half—are plaintiffs in this action. These 53 plaintiffs are thus in the position of claiming: purser and cabin attendant work is the same, the purser is nevertheless paid more because of sex discrimination (although we must admit that we negotiated to increase the purser differential), we could have become pursers by mere application and received the higher wage in the purser job, we preferred not to become pursers, and now we ask to be paid the purser wage even though we turned down the opportunity to apply for the purser job.

### E. THE CLAIM FOR CABIN ATTENDANTS ON DOMESTIC FLIGHTS

#### 1.

The comparison to this point has been almost entirely between the work of international cabin attendants and the work of pursers.

It is not necessary to compare in detail the work of pursers with that of domestic cabin attendants. There are no pursers on domestic flights and there is no claim by plaintiffs that the higher pay for international cabin attendants than for domestic cabin attendants is in violation of the Equal Pay Act or is in any way factually unjustified.

The work of the purser, however, is more different from, and more in excess of, the work of, the domestic cabin attendant than it is of the international cabin attendant. Among other factors in this respect are: the working hours are longer, the flights on the average are longer, there are more time zones to pass and more fatigue is thus caused, there is more night flying, absences from domicile bases are longer, there are more delays and other flight irregularities, and there must be dealings with foreign government documents and in foreign currency.

The more onerous work on international flights has always been recognized by those directly concerned. Despite the higher pay, there has been a reluctance on the part of domestic cabin attendants to transfer to international operations. It has been necessary at times for TWA involuntarily to assign domestic cabin attendants to international flights.

#### 2.

It remains to emphasize the nature of the claim made by plaintiffs for domestic cabin attendants. The claim is not that the work of the purser and of the domestic cabin attendant is "equal work". It is implicitly recognized that international cabin attendants and domestic cabin attendants do not perform "equal work" and it is accepted as lawful that the international cabin attendant be paid more than the domestic cabin attendant. The complaint therefore does not ask for an award to domestic cabin attendants of the difference between the wages they actually received and the wages paid to pursers. The complaint (para. XIV, (d)(i)) asks for an award to domestic cabin attendants of the difference

between what was paid to *international* cabin attendants and what was paid to pursers. This cannot be done under the Equal Pay Act. Not only does the prayer for relief concede that the work is not "equal" (because it accepts the pay differential between domestic and international cabin attendants as justified and lawful) but it asks the Court to determine the amount of the differential which should be paid to domestic cabin attendants for unequal work. "Congress did not intend to put either the Secretary or the courts in the business of evaluating jobs and determining what constituted a proper differential for unequal work". *Hodgson v. Corning Glass Works,* 474 F.2d 226, 231 (2d Cir. 1973), *aff'd sub nom. Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

## F. BACKGROUND FOR DETERMINING WHETHER PURSERS ON INTERNATIONAL FLIGHTS AND CABIN ATTENDANTS ON DOMESTIC FLIGHTS ARE EMPLOYED IN THE SAME "ESTABLISHMENT"

### 1.

█ The Equal Pay Act forbids discrimination on the basis of sex between employees "within any establishment in which such employees are employed". It is a part of the ordinary burden of proof of plaintiffs to show that they and the pursers are employed in the same "establishment".

There is no issue in this respect as to pursers and *international* cabin attendants. It is agreed that they are employed in the same "establishment". The issue is as to pursers and *domestic* cabin attendants, who plaintiffs contend are also employed in the same "establishment". TWA contends that the "establishment" of domestic cabin attendants is different from that of pursers.

### 2.

The factual situation in summary is as follows.

TWA separates its International Operations from its Domestic Operations and, as stipulated by the parties, "maintains separate International Operations and Domestic Operations".

Within its Domestic Operations, TWA has flight attendant bases (sometimes called "domiciles") in a number of cities, including New York, Los Angeles, and San Francisco.

Within its International Operations, TWA has two flight attendant bases, one at Kennedy Airport at New York and one at Los Angeles. For a period there was such a base at San Francisco for military flights only.

Where a domestic and an international base are located in the same city, there are separate bases for pursers and international cabin attendants on the one hand and domestic cabin attendants on the other.

The New York office of TWA (the site of its general headquarters and executive offices) notifies each base in advance of the scheduled flights assigned to that base. The flights are grouped in the form of "pairings" which consists of outbound flights originating at, and inbound flights terminating at, the base. A crew scheduling department at each separate base then builds "lines of time" (work assignments) for flight attendants at that base, either pursers and international cabin attendants or domestic cabin attendants. Each line of time consists of a combination of flight pairings designed for a job classification at that base, so as to constitute a month's scheduled work for individual flight attendants in that job classification at that base. TWA posts at each base all the lines of time for each job classification at that base. Thus, the lines of time for pursers would be posted at bases separate and different from the bases at which lines of time for domestic cabin attendants are posted. The flight attendants at each base then bid for the lines of time designed for their job classification. Pursers may bid only for international flights and domestic cabin attendants may bid only for domestic flights. These lines of time are then awarded at each base according to seniority.

It has been stipulated that, in "emergency situations", TWA has assigned an inter-

national cabin attendant to a domestic flight and vice versa. There seems no evidence how often this has been done, but since it is limited to "emergency situations" the instances must be rare. Voluntary transfers by cabin attendants between domestic and international operations cannot be freely made. There must be a vacancy before there can be a transfer. The collective bargaining agreement governs the conditions of transfer. There are restrictions on the frequency of permitted transfers and such transfers appear to have been so infrequent as to have no significance in the case at bar.

The geographical areas in which pursers work are different from those in which domestic cabin attendants work. Pursers fly (mostly over water) to and from foreign countries. Domestic cabin attendants fly (mostly over land) to and from points in the United States.

According to stipulation, the "work records" of pursers and domestic cabin attendants are kept in their respective (and therefore different) bases.

There is one collective bargaining agreement, which covers pursers, international cabin attendants and domestic cabin attendants. The union organization recognizes, however, the sharp distinction between domestic and international operations and, where in any city there is a domestic base and also an international base, there is a separate "local executive council" of the union for *each* base, each with its own elected officers.

There is a single loose leaf flight service manual, but this does not treat domestic and international flights together. There are separate sections of the manual that pertain to the separate service affected. These are so indicated by divider sheets, such as "flight duties/dining service-domestic", "flight duties/dining service-Atlantic", "flight duties/dining service-Pacific".

### 3.

The facts in this record do not show that the pursers and domestic cabin attendants are employed by TWA in the same "establishment".

### G.  THE DECISION IN *LAFFEY v. NORTHWEST AIRLINES, INC.*

### 1.

Plaintiffs understandably urge as support for a judgment in their favor *Laffey v. Northwest Airlines, Inc.*, 366 F.Supp. 763 (D.D.C.1973), *vacated and remanded in part, affirmed in part*, 567 F.2d 429 (D.C.Cir. 1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978).

The *Laffey* decision is not a precedent binding on this Court but the point is not of any significance here because in the context of the Equal Pay Act there must in any event be a case by case analysis of the facts in the record. This was illustrated in *Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) where two separate cases, No. 73–29 and No. 73–695, were before the Supreme Court, each involving alleged discriminatory practices in different plants of the same employer. The Supreme Court dealt with some of the issues in only one of the cases and explained in a footnote: "We deal with these issues, then, only on the basis of the record in No. 73–29. To the extent that there are any differences in the records in these two cases on factual matters relating to these questions, we leave it to the District Court and the Court of Appeals in No. 73–695 to resolve these questions, in the first instance, *on the basis of the record created in that case*". (417 U.S. at 204 fn. 26, 94 S.Ct. at 2233 fn. 26; emphasis supplied)

A study of the *Laffey* findings, conclusions, and opinion shows that there are so many factual differences between the *Laffey* case and this one that the *Laffey* decision has little, if any, value here as a precedent. To describe these differences in any detail would unreasonably extend this opinion. A few of the principal differences will be mentioned.

### 2.

Counsel for plaintiffs in the case at bar were counsel for plaintiffs in the *Laffey* case in some fashion. They are shown in the report of the trial court decision in

*Laffey* as "for a portion of the trial, for plaintiffs" (366 F.Supp. at 764). Counsel for plaintiffs at the *Laffey* trial is quoted as having made representations to the District Court there, with respect to the work and duties of TWA pursers and cabin attendants as compared with Northwest pursers and stewardesses. These representations are said (TWA Post-Trial Reply Memorandum, p. 5) to have been:

> We are prepared to prove that, in fact, the jobs on, for example, Trans World Airlines are quite different from the two comparably titled jobs on Northwest Airlines ... [T]he stewardesses [sic] on TWA are not assigned responsibilities for the flight [w]hether there is a purser on board or not.

3.

Northwest had established the position of Senior Cabin Attendant. This flight attendant had supervision of service in the cabin and on any particular flight, domestic or international, would be a purser or a stewardess. If a stewardess, she received the same lower pay as usual; if a purser, he received the same higher pay as usual. On TWA, the situation was entirely different. The purser was always "in charge" of cabin service and never flew on domestic flights. A cabin attendant was never "in charge" of cabin service on any TWA international flight.

Northwest had a history unlike that of TWA with respect to the sex of its pursers and stewardesses. At the time of the District Court judgment in *Laffey* in 1973, Northwest had one female purser, who had taken a reduction in pay when she was made a purser. At the time of the commencement of the case at bar in 1970, TWA had 45 female pursers who had received pay increases when promoted to purser.

The stewardess on Northwest was found to have duties with respect to the completion of documents. The cabin attendant on TWA has none.

The Northwest stewardess, as well as the Northwest purser, was found to be responsible for inventory of liquor, for accounting for sales receipts, and for accounting for the liquor itself. On TWA, only the purser has these responsibilities.

The duties of a Northwest stewardess and a Northwest purser were found to be substantially the same. It has been found herein that the TWA purser has many duties additional to and different from those of TWA cabin attendants.

## H. CONCLUSIONS

1.

The evidence does not prove that domestic cabin attendants and pursers are employed by TWA within the same "establishment" as that word is used in the Equal Pay Act.

2.

The evidence does not prove that domestic cabin attendants and pursers are employed by TWA on jobs which are performed under similar working conditions.

3.

The evidence does not prove that the domestic cabin attendants and pursers employed by TWA perform equal work on jobs the performance of which requires equal skill, effort, and responsibility.

4.

The evidence does not prove that the international cabin attendants and pursers employed by TWA perform equal work on jobs the performance of which requires equal skill, effort, and responsibility.

5.

The evidence does not prove that TWA has discriminated on the basis of sex in respect of wages paid pursers and cabin attendants, domestic or international.

6.

The evidence does not prove that TWA has violated the Equal Pay Act in respect of wages paid pursers and cabin attendants, domestic or international.

The foregoing contains the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

On the Second Amended Complaint, the Clerk of the Court is directed to enter judgment in favor of defendant TWA.

On the counterclaim, the Clerk is directed to enter judgment in favor of plaintiffs.

On the cross-claim against defendants TWU and Local 550, the Clerk is directed to enter judgment in favor of defendants TWU and Local 550.

On the cross-claim against defendant Local 551, the Clerk is directed to enter judgment in favor of defendant Local 551.

SO ORDERED.